FILED

2023 Oct-13  AM 11:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| ASHLEY CASWELL, | |
| Plaintiff, | |
| v. | Civil Action No. |
| ETOWAH COUNTY, ALABAMA; ETOWAH COUNTY SHERIFF JONATHON HORTON, *in his official and individual capacities*; CHIEF KEITH PEEK, *in his official and individual capacities*; DOCTORS' CARE PHYSICIANS, P.C., *an Alabama professional corporation*; CED MENTAL HEALTH SERVICES, *an Alabama non-profit corporation*; DR. ROGER S. BUCK, *in his official and individual capacities*; DR. THOMAS A. PAGE, *in his official and individual capacities*; CASSI R. PEEK, a/k/a CASSI KELLET, *in her official and individual capacities*; LYNDA DILLARD, *in her official and individual capacities*; MARTHA LOPEZ, *in her official and individual capacities*; DENNIS PRESLEY, *in his official and individual capacities*; KRISTEN WARD, a/k/a KRISTEN GUFFEY, a/k/a KRISTEN PRESLEY, *in her official and individual capacities*; ZOEY RANDOLPH, *in her official and individual capacities*; JENNIFER MCINTYRE, *in her official and individual capacities*; CHELLSEA DAVIS, *in her official and individual capacities*; LYNNE HOLLIDAY, *in her official and individual capacities*; JERRY KING, *in his official and individual capacities*; CHRIS THORNTON, *in his official and individual capacities*; JANE DOE 1, *in her official and individual capacities*; JOHN OR JANE DOE 2, *in his or her official and individual capacities*; | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff, by and though counsel, brings this action against Defendants and alleges as follows:

### INTRODUCTION

1.      At every turn throughout Plaintiff Ashley Caswell's pregnancy and delivery of her baby, the Etowah County Detention Center ("ECDC") failed her.  For almost the entirety of Ms. Caswell's high-risk pregnancy, which she spent behind bars, ECDC staff continuously exhibited callous indifference toward Ms. Caswell's pregnancy-related medical needs.  Jail staff ignored her requests for regular prenatal care, refused to provide her with access to her critical mental-health prescription medications, and even denied her basic accommodations, forcing her to sleep on a thin mat on a concrete floor.  This ongoing mistreatment culminated on October 16, 2021, the day of her delivery.  Although Ms. Caswell was obviously in painful labor, ECDC staff refused to transport her to the hospital.  Instead, ECDC staff forced Ms. Caswell to endure nearly 12 hours of unmedicated labor alone in a jail cell and ignored her cries of pain and repeated pleas for assistance.  Ms. Caswell ultimately had no choice but to deliver her baby unassisted—not in a hospital or even ECDC's medical unit—but in a jail shower room.  Ms. Caswell suffered excruciating pain and a placental abruption that almost led to her death.  After Ms. Caswell delivered, ECDC staff looked on as she lay on the floor bleeding.  Instead of attending to Ms. Caswell, ECDC staff took pictures with her newborn baby while the umbilical cord was still connected to Ms. Caswell.

2.      Even after Ms. Caswell returned to ECDC following her needlessly traumatic labor and delivery, ECDC staff treated her with contempt.  They again forced Ms. Caswell to sleep on the floor and denied her basic care, including her physician-prescribed Ibuprofen to manage the pain from her delivery and a breast pump to allow her to express breastmilk and prevent agonizing

2

pain and infection.  ECDC staff's blatant indifference turned what should have been one of the happiest times of Ms. Caswell's life, her pregnancy and delivery of her son, into a nightmare.

3.      High-risk pregnancies like Ms. Caswell's are precisely the sort of pregnancies that require close medical attention and pre- and postpartum care.  Defendants denied Ms. Caswell that care through their callous and deliberate indifference to her health and safety and that of her developing baby.  As a direct result of Defendants' conduct, Ms. Caswell experienced extreme physical, mental, and emotional pain and suffering.

4.      Etowah County subjects more pregnant and postpartum women per capita to criminal prosecution and pretrial incarceration for pregnancy-related charges than any other large county in Alabama or throughout the United States.  Between 2015 and 2023, Etowah County arrested at least 257 pregnant women and new mothers.[1]  Accordingly, it was foreseeable and plainly obvious that Defendants would need to attend to the medical needs of pregnant and postpartum women, yet Defendants developed a persistent policy, custom, and practice of doing precisely the opposite.

5.      Indeed, Ms. Caswell's experience, shocking as it is, is not an isolated event.  There is a persistent and widespread history, custom, and practice at ECDC of denying, delaying, or providing plainly inadequate medical care to detained individuals who are pregnant or postpartum in the face of serious and obvious medical needs.  In recent years, Defendants' conduct has resulted in many other pregnant women at ECDC receiving grossly inadequate pre- and postpartum care, or, in many instances, no care at all.  Ms. Caswell herself experienced callous indifference to her medical needs at ECDC during an earlier pregnancy in 2019.  ECDC staff has denied medical care

---

[1]      Amy Yurkanin, *One Alabama County Cracked Down on Pregnant Drug Users. 10 Years Later, Has it Gone Too Far*, AL.com (July 31, 2023), https://www.al.com/news/anniston-gadsden/2023/07/one-alabama-county-pledged-to-crack-down-on-pregnant-drug-users-ten-years-later-has-it-gone-too-far.html.

to numerous other women with serious and obvious medical needs similar to Ms. Caswell's while they were pregnant or postpartum, including denial of adequate prenatal care, refusal to provide prescribed medications, refusal to provide access to external medical providers even in the face of emergency medical issues such as ongoing labor and delivery, refusal to provide beds and other basic living necessities for pregnant and postpartum women, and denial of proper postpartum care, including provision of a breast pump. This pattern of deficient care has resulted in grievous harm, including at least one stillbirth.

6.     These deprivations were obvious, flagrant, rampant, and of a continuous duration such that Defendants, including Etowah County, Etowah County Sheriff Jonathan Horton, Chief Keith Peek, Doctors' Care Physicians, P.C., CED Mental Health Services, Dr. Roger Buck, Dr. Thomas Page, and Cassi Peek, had notice and knowledge of the widespread abuse and the need to correct the problems.

7.     The medical care failures at ECDC stem from Defendant Etowah County's policy, custom, and practice of inadequate medical funding, as well as the widespread policies, customs, and practices instituted by Defendants Doctors' Care and CED Mental Health Services, the medical and mental health contractors at ECDC.

8.     Ms. Caswell brings this action against Defendants for violations of her rights under the Fourteenth Amendment and Alabama common law, both of which proscribe the deliberate indifference Defendants have exhibited toward Ms. Caswell's serious medical needs. Ms. Caswell seeks redress for these violations and compensation for the staggering physical and emotional damage she has suffered as a result of Defendants' conduct.

## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Ms. Caswell brings this action under 42 U.S.C. § 1983 to remedy violations of her constitutional rights.

10.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Ms. Caswell's claims arising under the laws of the State of Alabama, because those state law claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to Ms. Caswell's claims occurred in this judicial district.  In addition, on information and belief, all Defendants reside in the state of Alabama and at least one Defendant resides in this judicial district.

## PARTIES

12.     Plaintiff Ashley Caswell is a resident of Attalla, Alabama, and has been incarcerated at Tutwiler Prison in Wetumpka, Alabama, since January 11, 2023.  During the events giving rise to this action, Ms. Caswell was detained pretrial at ECDC in Gadsden, Alabama.

13.     Defendant Etowah County, Alabama ("Etowah County"), is a municipal corporation organized and existing under the laws of the State of Alabama with the ability to sue and be sued within the State of Alabama.  Defendant Etowah County is responsible for providing funding to ECDC, including for medical care, and is responsible for the policies, customs, and practices related to the funding of the facility.

14.     Defendant Sheriff Jonathon Horton is, and at all relevant times was, the Sheriff of Etowah County, acting under color of state law and within the scope of his employment.  In this position, Defendant Sheriff Horton is responsible, through the Etowah County Sheriff's Office,

for the operation of ECDC.  Defendant Sheriff Horton has final authority and responsibility for administering, managing, and supervising medical care services at ECDC.  Defendant Sheriff Horton is sued in both his official and individual capacities.

15.     Defendant Chief Keith Peek is the current Chief of Administration and former Chief of Detention for the Etowah County Sheriff's Office, acting under color of state law and within the scope of his employment.  In these positions, Chief Peek was and is responsible, through the Etowah County Sheriff's Office, for the operation of ECDC.  As Defendant Sheriff Horton stated during an interview for A&E's "60 Days In" reality series, which filmed at the facility in 2019, "no one knows [ECDC] as well as Chief Peek."[2]   The operation of ECDC includes the provision of medical care services to people detained at the facility, including related policies, customs, and practices, and Defendant Keith Peek had knowledge of the same.  Defendant Keith Peek is sued in both his official and individual capacities.

16.     Defendant Doctors' Care Physicians, P.C. ("Doctors' Care"), is an Alabama professional corporation with a registered office at 307 East Meighan Blvd. in Gadsden, Alabama.  Doctors' Care contracts with Defendant Etowah County to provide medical care services at ECDC.  Since at least 2005, Etowah County has contracted with Defendant Doctors' Care to provide medical care services at ECDC.  At all relevant times, Doctors' Care was responsible for implementing, overseeing, and supervising policies, customs, and practices regarding medical care at ECDC, and had knowledge of the same.  Doctors' Care was, at all relevant times, acting under color of state law and through its lawful agents, including the individual Defendants and other ECDC employees.

---

[2]     *60 Days In: Season 6, Episode 1* (A&E television broadcast Jan. 2, 2020), https://www.aetv.com/shows/60-days-in/season-6/episode-1.

17.    Defendant CED Mental Health Services ("CED") is an Alabama non-profit corporation with a registered office at 425 5th Ave NW, Attalla, Alabama 35954.  CED contracts with Etowah County and/or Doctors' Care to provide mental health care services at ECDC. Defendants Etowah County and/or Doctors' Care has contracted with Defendant CED to provide mental health care services at ECDC since at least 2021.  At all relevant times since on or around September 2021, CED was responsible for implementing, overseeing, and supervising policies, customs, and practices regarding mental health care at ECDC, and had knowledge of the same. CED was, at all relevant times since on or around September 2021, acting under color of state law and through its lawful agents, including the individual Defendants and other employees at ECDC.

18.    Defendant Dr. Roger S. Buck is, and at all relevant times was, the Founder, registered agent, and Medical Director of Doctors' Care, the medical contractor for ECDC, acting under color of state law and within the scope of his employment.  At all relevant times, Dr. Buck was responsible for creating, implementing, overseeing, and supervising the policies, customs, and practices regarding medical care at ECDC, and had knowledge of the same.  Defendant Buck is sued in both his official and individual capacities.

19.    Defendant Dr. Thomas A. Page is, and at all relevant times was, an employee of Doctors' Care, the medical contractor for ECDC, and served as the Medical Director at ECDC, acting under color of state law and within the scope of his employment.  At all relevant times, Dr. Page was responsible for creating, implementing, overseeing, and supervising the policies, customs, and practices regarding medical care at ECDC, and had knowledge of the same. Defendant Page is sued in both his official and individual capacities.

20.    Defendant Cassi R. Peek, who was known as Cassi Kellet during the relevant period, is, and at all relevant times was, the Health Services Administrator at ECDC and the

Practice Administrator at Doctors' Care, employed by Etowah County, the Etowah County Sheriff's Office, and/or Doctors' Care, acting under color of state law and within the scope of her employment.   Defendant Cassi Peek was, at all relevant times, responsible for creating, implementing, overseeing, and supervising the policies, customs, and practices regarding medical care at ECDC, and had knowledge of the same.  Defendant Cassi Peek is sued in both her official and individual capacities.

21.    Defendant Lynda Dillard was, at all relevant times, an Emergency Medical Technician ("EMT") at ECDC employed by Etowah County, the Etowah County Sheriff's Office, and/or Doctors' Care, acting under color of state law and within the scope of her employment. Defendant Dillard is sued in both her official and individual capacities.

22.    Defendant Martha Lopez was, at all relevant times, a medical professional at ECDC employed by Etowah County, the Etowah County Sheriff's Office, and/or Doctors' Care, acting under color of state law and within the scope of her employment.  Defendant Lopez is sued in both her official and individual capacities.

23.    Defendant Dennis Presley was, at all relevant times, a medical professional at ECDC employed by Etowah County, the Etowah County Sheriff's Office, and/or Doctors' Care, acting under color of state law and within the scope of his employment.  Defendant Presley is sued in both his official and individual capacities.

24.    Defendant Kristen Ward, a/k/a Kristen Guffey, a/k/a Kristen Presley, was, at all relevant times, a medical professional at ECDC employed by Etowah County, the Etowah County Sheriff's Office, and/or Doctors' Care, acting under color of state law and within the scope of her employment.  Defendant Ward is sued in both her official and individual capacities.

8

25.     Defendant Zoey Randolph was, at all relevant times, a rover and/or a correctional officer at ECDC employed by Etowah County, the Etowah County Sheriff's Office, acting under color of state law and within the scope of her employment.  Defendant Randolph is sued in both her official and individual capacities.

26.     Defendant Jennifer McIntyre was, at all relevant times, a correctional officer at ECDC employed by Etowah County and/or the Etowah County Sheriff's Office, acting under color of state law and within the scope of her employment.  Defendant McIntyre is sued in both her official and individual capacities.

27.     Defendant Chellsea Davis was, at all relevant times, a Captain at ECDC employed by Etowah County and/or Etowah County Sheriff's Office, acting under color of state law and within the scope of her employment.  Defendant Davis is sued in both her official and individual capacities.

28.     Defendant Lynne Holliday was, at all relevant times, a Captain at ECDC employed by Etowah County and/or Etowah County Sheriff's Office, acting under color of state law and within the scope of her employment.  Defendant Holliday is sued in both her official and individual capacities.

29.     Defendant Jerry King was, at all relevant times, a correctional officer at ECDC employed by Etowah County and/or the Etowah County Sheriff's Office, acting under color of state law and within the scope of his employment.  Defendant King is sued in both his official and individual capacities.

30.     Defendant Chris "Tomb" Thornton was, at all relevant times, a correctional officer at ECDC employed by Etowah County and/or the Etowah County Sheriff's Office, acting under

color of state law and within the scope of his employment.  Defendant Thornton is sued in both his official and individual capacities.

31.     Defendants John and Jane Does ("Doe Defendants") are individuals who were at all relevant times staff at ECDC employed by Etowah County, the Etowah County Sheriff's Office, Doctors' Care, and/or CED, whose (i) identities are known to Ms. Caswell, but whose full legal names are not currently known to Ms. Caswell, or (ii) who were involved in the events that form the basis of this Complaint but are presently unknown to Ms. Caswell.  They include:

   a.   Jane Doe 1 was, at all relevant times, a medical professional at ECDC employed by Etowah County, the Etowah County Sheriff's Office, and/or Doctors' Care, acting under color of state law and within the scope of her employment.  Jane Doe 1 worked as a medication nurse at ECDC and had red hair, was approximately 5'2", and in her late 30s or early 40s.

   b.   John or Jane Doe 2 was assigned to the medical unit at ECDC on October 16, 2021, and, when Defendant Randolph radioed to report that Ms. Caswell was bleeding in the shower room, responded that she should just "wash it off."

The full legal names or identities of the Doe Defendants can be uncovered through discovery.  Ms. Caswell will amend her Complaint to identify the Doe Defendants at an appropriate time.  The Doe Defendants acted under color of state law and within the scope of their employment.  The Doe Defendants are sued in both their official and individual capacities.

## FACTS

32.     ECDC is a county detention center located in Gadsden, Alabama, operated by the Etowah County Sheriff's Office.  Upon information and belief, ECDC is primarily a pretrial detention facility.  Ms. Caswell was first detained at ECDC from on or around January 2, 2019, to on or around January 8, 2020, and then from on or around March 16, 2021, to on or around

April 8, 2022.  Ms. Caswell was pregnant both times she was detained at ECDC.  While Ms. Caswell experienced mistreatment and received inadequate medical care during both periods of detention, the events giving rise to this action occurred during her 2021-22 detention.

A. **ECDC Officials Were Deliberately Indifferent to Ms. Caswell's Serious Medical Needs During Her 2021 Pregnancy, Her Delivery, and Her Postpartum Period**

33.     On or around March 16, 2021,[3] Ms. Caswell was arrested on a chemical endangerment charge.  She was approximately two months pregnant at the time of her arrest, and her pregnancy was classified as high risk due to her diagnosed hypertension, advanced maternal age, and history of abnormal pap smears.

34.     Defendants—specifically Defendants Horton, Keith Peek, Buck, Page, Cassi Peek, Dillard, Lopez, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, Jane Doe 1, and John or Jane Doe 2—knew that Ms. Caswell was pregnant at the time of her booking given the nature of her chemical endangerment charge, which was based on an allegation of substance use during pregnancy.  Defendants also knew that Ms. Caswell's pregnancy was high risk because they had access to Ms. Caswell's medical records and medical history, and her various high-risk conditions were documented in her medical chart at her first obstetric care appointment while in ECDC custody on April 7, 2021.  Moreover, Defendants knew or should have known that Ms. Caswell had a history of high-risk pregnancies because she had previously been detained at ECDC with a high-risk pregnancy in 2019, which was documented in her medical records.

35.     Despite knowing that Ms. Caswell was pregnant and that her pregnancy was high risk, Defendants were deliberately indifferent to Ms. Caswell's serious medical needs, denying her prescribed psychiatric medication, denying her adequate prenatal care, denying her care and

---

[3]     Ms. Caswell's criminal docket lists her arrest date as March 16, 2021, but her records from ECDC include an intake form from March 13, 2021.  This complaint refers to her arrest date as March 16, 2021, throughout.

transport to the hospital during labor and delivery, denying her adequate postpartum care, and denying her a prescribed breast pump.

### i.      Defendants Denied Ms. Caswell Her Prescribed Psychiatric Medications

36.     After her arrest, ECDC staff prohibited Ms. Caswell from taking Zoloft, her prescribed psychiatric medication, and informed her that she may not take it because she was pregnant.  ECDC staff did not provide Ms. Caswell with access to any other psychiatric medications for months.

37.     Ms. Caswell was previously permitted to take Zoloft while pregnant when she was detained at ECDC in 2019.  This was reflected in her jail medical records, along with her diagnoses for bipolar disorder, post-traumatic stress disorder, depression, and anxiety.  Defendants Dillard, Lopez, Ward, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, and Jane Doe 1 therefore knew or ought to have known that Ms. Caswell was permitted to take Zoloft while pregnant, because they had access to Ms. Caswell's medical records and medical history.

38.     Defendants also were aware that Ms. Caswell previously had been hospitalized for a suicide attempt that occurred when ECDC staff initially refused to provide her prescribed psychiatric medication during her 2019 pregnancy.

39.     Without her Zoloft, Ms. Caswell began to experience increased symptoms of depression.  Ms. Caswell made numerous verbal and written requests to ECDC staff, including Defendants Dillard, Lopez, Ward, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, and Jane Doe 1, pleading for her medication.  But Defendants continued to deny Ms. Caswell access to her prescribed medication.  Ms. Caswell even submitted a formal grievance form documenting ECDC's refusal to provide her with her lawfully prescribed Zoloft.  She did not receive any response.

40.     On or around July 17, 2021, following instructions from Ms. Caswell's OB/GYN at Women's Health Partners, ECDC medical staff switched Ms. Caswell's prescription from Zoloft to Cymbalta and Celexa.  Following this change, ECDC staff would sporadically provide Ms. Caswell with Cymbalta and Celexa, but the access was inconsistent.  Ms. Caswell made multiple verbal requests to ECDC medical staff about her medication, including Defendants Dillard, Lopez, Ward, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, and Jane Doe 1, but her requests were often ignored.  ECDC staff denied Ms. Caswell consistent access to her lawfully prescribed psychiatric medication for the duration of her 2021 pregnancy and during her postpartum recovery, even after her highly traumatic labor and delivery exacerbated her psychological distress and her OB/GYN instructed to increase her Cymbalta.

41.     Upon information and belief, CED began providing mental health services to ECDC in approximately September 2021.  After CED began providing mental health services at ECDC, Ms. Caswell continued to have trouble gaining access to her medication.  Ms. Caswell never met with a doctor from CED to discuss her medication.  Her requests to CED staff for regular access to her prescribed medication were unsuccessful.

42.     It was not until November 2021, when Ms. Caswell returned to her OB/GYN for a postpartum appointment, that she began to receive consistent access to her Cymbalta and Celexa medications.  After discussing her symptoms of postpartum depression, Ms. Caswell's OB/GYN noted her prescription on the paperwork given to ECDC. Only then did ECDC staff finally give Ms. Caswell regular access to her medication.

43.     Defendants Doctors' Care, CED, Dillard, Lopez, Ward, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, and Jane Doe 1 were deliberately indifferent to Ms. Caswell's serious medical needs by ignoring her repeated requests for access to her prescription

psychiatric medications.   Defendants' actions and inactions directly violated Ms. Caswell's constitutional rights because they forced her to endure increased, dangerous symptoms of depression while experiencing a high-risk pregnancy and while she was postpartum following a traumatic labor and delivery.

### ii.     Defendants Denied Ms. Caswell Adequate Prenatal Care

44.     Ms. Caswell was approximately two months pregnant when she was arrested on March 16, 2021.  She was taken to her first prenatal care appointment approximately three weeks later on April 7, 2021.  At that appointment, medical staff confirmed that Ms. Caswell had a high-risk pregnancy due to her advanced maternal age, history of abnormal pap smears, and hypertension.  Due to this diagnosis, regular prenatal care appointments, especially during the third trimester, were critical to maintain the health of both Ms. Caswell and her growing baby.[4]

45.     It was previously ECDC's practice to take people detained at the facility with high-risk pregnancies to the Maternal Fetal Medicine Division at University of Alabama Medicine in Birmingham ("UAB") for pregnancy care, as UAB is equipped to provide more specialized care to high-risk pregnant patients than Women's Health Partners or Gadsden Regional.  Due to her high-risk factors, ECDC staff had taken Ms. Caswell to UAB for prenatal appointments and for her delivery during her earlier 2019 pregnancy.

46.     Despite having the exact same risk factors—hypertension, advanced maternal age, and history of abnormal pap smears—in her 2021 pregnancy as her 2019 pregnancy, ECDC staff did not take Ms. Caswell to UAB for prenatal care during her 2021 pregnancy.  When Ms. Caswell

---

[4]     *See* AM. ACAD. OF PEDIATRICS & AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, GUIDELINES FOR PERINATAL CARE 150 (8th ed. 2017) (recommending biweekly appointments between twenty-eight and thirty-six weeks of pregnancy and weekly appointments thereafter for an "uncomplicated … pregnancy" and "closer surveillance" for "[w]omen with medical or obstetric problems").

asked ECDC staff why they were not taking her to UAB, she was told that it was because ECDC did not have enough people to transport her there.

47.     ECDC staff, including Defendants Dillard, Lopez, Page, Presley, McIntyre, and Holliday had access to Ms. Caswell's medical records and medical history, and were aware of or ought to have been aware of the classification of her pregnancy as high risk, and that she needed regular prenatal care.  Defendant Doctors' Care also had been ECDC's medical contractor during Ms. Caswell's prior pregnancy and had knowledge of her medical records and medical history.

48.     Defendants failed to take Ms. Caswell to her weekly prenatal appointments even after week 36 of her pregnancy—the point at which weekly visits are recommended for all pregnancies and are even more critical for high-risk pregnancies like Ms. Caswell's.  Defendants allowed Ms. Caswell to attend just two prenatal appointments during this crucial period.

49.     Ms. Caswell asked ECDC staff, including Defendants Dillard, Lopez, Page, Presley, McIntyre, and Holliday, directly to take her to regular prenatal appointments, but they regularly disregarded her requests.

50.     Defendants, including Defendants Dillard, Lopez, Page, Presley, McIntyre, and Holliday, were deliberately indifferent to Ms. Caswell's serious medical needs by ignoring her repeated requests for medically necessary prenatal appointments during the end of her high-risk pregnancy.  As a direct result of Defendants' actions and inactions, Ms. Caswell's constitutional rights were violated because she did not receive regular prenatal medical attention necessary for her high-risk pregnancy.

### iii.     Defendants Denied Ms. Caswell Medical Care During Labor and Delivery and Failed to Transport Her to the Hospital

51.     On or around September 11, 2021, Ms. Caswell began experiencing contractions and pains in her abdomen.  She was transported to Gadsden Regional, where she was diagnosed

with Braxton Hicks contractions—contractions of the uterus leading up to labor that are often mistaken as labor contractions.[5]  Ms. Caswell continued to experience these contractions and pain in her sides up until her labor.  Medical records from the hospital note that Ms. Caswell was experiencing "poor nutrition," was "highly stressed," and was having trouble sleeping.  Medical professionals at Gadsden Regional informed Ms. Caswell that, along with these factors, the fact that she was sleeping on the floor at ECDC was a likely cause of these contractions and pains.

52.     ECDC staff forced Ms. Caswell to sleep on the floor for the duration of her pregnancy.  ECDC staff does not permit pregnant women to sleep on top bunks, yet they housed Ms. Caswell in the same cell with others who had bottom bunk profiles.  Because the bottom bunk was occupied, Ms. Caswell had to sleep on the floor.  Just as during her 2019 pregnancy, Ms. Caswell had only a single mat to sleep on, even though ECDC staff were supposed to provide pregnant women with double or triple mats.  On occasion, Ms. Caswell would try to sleep on the top bunk, but correctional officers, including Defendant McIntyre, informed her that pregnant women were not allowed to sleep on the top bunk and required her to move back to the floor.

53.     Despite the doctors' suggestion at Gadsden Regional that sleeping on the floor was increasing her pre-labor contractions and pain, ECDC staff forced Ms. Caswell to sleep on the floor.

54.     Additionally, during the approximately four weeks leading up to her delivery, Ms. Caswell began leaking fluid from her vagina.  During her previous pregnancies, Ms. Caswell had experienced similar leaking when her water broke before delivery.  Ms. Caswell alerted ECDC medical staff on multiple occasions about the leaking and her concerns that her water had broken.

---

[5]     *See* Cleveland Clinic, *Braxton Hicks Contractions*, https://my.clevelandclinic.org/health/symptoms/22965-braxton-hicks (last reviewed May 10, 2022).

ECDC medical staff did not check to confirm whether the leaking was amniotic fluid on these occasions and instead would merely check whether Ms. Caswell was "crowning." ECDC medical staff did not provide Ms. Caswell with any additional care for her fluid leakage or move her to the medical unit until on or around October 15, 2021.

55.    On October 16, 2021, three days before Ms. Caswell was scheduled to have her labor induced, she felt a large burst of fluid from her vagina around 6:00 a.m. Ms. Caswell understood that her water had broken. She was already in the medical unit, so she immediately alerted Defendant Lopez, who was working at the time. Defendant Lopez tested the fluid and confirmed that Ms. Caswell's amniotic fluid membrane had ruptured.

56.    Ms. Caswell's water broke before her labor contractions started, which is defined as premature rupture of membranes ("PROM"). The most significant potential consequence of PROM is intrauterine infection, the risk of which increases with the duration of membrane rupture; prompt medical care is necessary to avoid imperiling the life of the mother and baby.[6] Patients with PROM should be evaluated by a qualified provider to assess for labor, bleeding, risk of infection, and fetal heart rate pattern.

57.    Ms. Caswell told Defendants Dillard and Lopez—who were changing shifts—that she was in labor and needed to be taken to the emergency room immediately. Defendant Lopez told Ms. Caswell that she "just needed to lie down" in a cell in the medical unit, and that she would have her baby in three days when she was scheduled to be induced. Shortly after, Defendant Lopez left for the day, without providing Ms. Caswell with any medical care.

58.    The ECDC staff present in the medical unit—including Defendants Dillard, Lopez, Presley, Randolph, and King—were deliberately indifferent to Ms. Caswell's obvious and serious

---

[6]    Am. Coll. of Obstetricians & Gynecologists, *ACOG Practice Bulletin: Prelabor Rupture of Membranes*, 136 OBSTETRICS & GYNECOLOGY 1061, 1061 (2020).

medical need and failed to transport her to the hospital and to closely monitor and examine her following her amniotic fluid membrane rupture.

59.     ECDC medical staff were deliberately indifferent to Ms. Caswell's need for medical assistance despite the many risks of laboring and delivering without medical care in a jail, including infections and life-threatening conditions for both the mother and the baby.  Further, after her water broke, Ms. Caswell began experiencing vaginal bleeding, which can be an indicator of placental abruption, with which Ms. Caswell was later diagnosed.[7]  Medical professionals, upon learning of heavy vaginal bleeding during labor, should closely monitor both the baby's and the mother's vital signs and be prepared to perform emergency cesarean sections.[8]

60.     Because Defendant Dillard refused to provide assistance, Ms. Caswell was in such excruciating pain that she began screaming for help and begging to go to the hospital.  The pain was so intense that she started vomiting at approximately 8:00 a.m. and continued to throw up repeatedly until she delivered around 6:00 p.m., nearly 10 hours later.  Ms. Caswell labored alone in a cell in the medical unit for 11 or 12 hours, constantly screaming from the agonizing pain and begging for help.  Ms. Caswell was exhibiting obvious signs of painful and active labor, which is objectively a serious medical need.

61.     No one came to Ms. Caswell's aid.  Defendant Dillard told Ms. Caswell to "sleep it off," "stop screaming," and just "deal with the pain."  At one point while Ms. Caswell was in labor, Defendant Dillard said that people had "had babies before" in ECDC and "it was nothing they couldn't handle."  Ms. Caswell repeatedly requested pain medication, including an epidural.

---

[7]     Am. Coll. of Obstetricians & Gynecologists, *ACOG Practice Bulletin: Prelabor Rupture of Membranes*, 130 OBSTETRICS & GYNECOLOGY 168, 171 (2017).

[8]     *See generally* PAMELA SCHMIDT, CHRISTY SKELLY, & DEBORAH RAINES, PLACENTAL ABRUPTION (2023).

Eventually Defendant Dillard provided Ms. Caswell with a single Tylenol pill, which Ms. Caswell threw up.

62.     While Ms. Caswell labored, other people detained in the jail continued to enter the medical unit for various reasons, and the fact that Ms. Caswell was experiencing a health emergency became common knowledge throughout ECDC.  Defendants Randolph and King were also present in the medical unit throughout the day and thus were aware of Ms. Caswell's ongoing health emergency.

63.     Multiple other people detained at the facility heard Ms. Caswell screaming and told ECDC staff that Ms. Caswell needed medical attention.  Another detainee in the medical unit said that he was "tired of hearing [Ms. Caswell] scream" and told ECDC staff that they had to "do something."

64.     At one point, Defendant Dillard told another detainee, who had expressed concern about Ms. Caswell, that Ms. Caswell was "not in full labor" and was "fine."  After hearing the comment, Ms. Caswell yelled through the cell door that she was in labor.  Defendant Dillard did not respond.

65.     In the late evening, Defendant Dillard left before her shift ended.  She told Ms. Caswell she had to leave to deal with a "crisis at home" and did not have "time to deal" with Ms. Caswell's medical needs.

66.     Defendant Presley came to the medical unit to fill in for Defendant Dillard. Defendant Presley told Ms. Caswell that she "better not have that baby today" and that she should "wait until Monday" because he "didn't feel like dealing with a baby."  Shortly after he arrived, Defendant Presley left Ms. Caswell in the medical unit to go distribute medication.

67.     Ms. Caswell continued to leak amniotic fluid and blood and experienced intense pain as she labored throughout the day and into the evening.  Despite her repeated pleas for help and continued requests to be transported to the hospital, Defendants Dillard, Lopez, Presley, Randolph, King, and John or Jane Doe 2, were deliberately indifferent to Ms. Caswell's repeated requests for care.

68.     At around 6:00 p.m., Defendant Randolph walked Ms. Caswell to the quarantine shower room at ECDC.  No medical staff accompanied them.  Ms. Caswell was bleeding profusely and experiencing unbearable pain during the entirety of her walk to the shower room.

69.     Once they reached the shower room, Defendant Randolph alerted all ECDC staff via radio that Ms. Caswell was bleeding.  Defendant John or Jane Doe 2 from the medical unit radioed back and told Ms. Caswell to "wash it off in the shower" and that "she would be fine."  No other ECDC staff or medical staff came to assist Ms. Caswell.

70.     Defendant McIntyre was assigned to the quarantine unit and was aware of Ms. Caswell's acute medical need.  But instead of providing aid, Defendant McIntyre "locked down" the surrounding units by forcing all detainees to return to their cells, including trustee Misty Yates, who had attempted to help Ms. Caswell.

71.     When Ms. Caswell reached the shower in the quarantine unit, which was visible to all ECDC staff and people detained in the unit, she felt her baby start to emerge from her body.

72.     Ms. Caswell screamed in pain and begged for assistance, but Defendant Randolph said that she had no experience with deliveries and no other medical personnel were present.

73.     While Ms. Caswell continued to scream in pain and cry for help, Defendant McIntyre kept others from entering the shower room.  Defendant Randolph stayed a few feet away from Ms. Caswell and did not assist Ms. Caswell as she delivered.  Defendants McIntyre and

Randolph were deliberately indifferent to Ms. Caswell's serious medical need by failing to offer Ms. Caswell any aid during her delivery.

74.     Ms. Caswell was left to deliver alone in the shower area, dealing with intense pain and fear for both her and her baby's safety.  She turned off the water and delivered her baby while standing upright on a concrete floor, without the aid of any medical personnel or medication.

75.     During her delivery, Ms. Caswell experienced severe and sharp pain unlike anything she had ever felt in the deliveries of her previous children.  Ms. Caswell felt intense pain in her back so extreme she felt "as if [her] body was ripping apart."  Ms. Caswell told medical staff about the intense pain.

76.     In the face of this blinding pain, Ms. Caswell caught her baby's head and noticed that she was bleeding profusely.  Due to the blood loss, she became severely lightheaded.  Fearing she was about to faint, Ms. Caswell directed Defendant Randolph where to stand and how to catch the baby.

77.     Immediately after handing her newborn to Defendant Randolph, Ms. Caswell fainted due to her blood loss.  Defendants left Ms. Caswell unconscious and naked on the floor of the quarantine shower unit while she continued to bleed.

78.     After Ms. Caswell gave birth, multiple ECDC staff members, including Defendants Presley, Ward, Davis, and Thornton, arrived at the shower.

79.     After Ms. Caswell regained consciousness, Defendant Davis took the baby from Defendant Randolph.  Ms. Caswell begged those present to stop moving the baby around, as he was still connected to the umbilical cord attached to the placenta inside her body.  As Defendants passed her baby around, Ms. Caswell felt the umbilical cord tug.

80.     Without asking Ms. Caswell for consent, Defendant Thornton took a picture of Defendants Davis and Randolph with the newly born baby.  All the while, Ms. Caswell lay naked and bleeding on the floor of the shower.  She begged the ECDC staff for a T-shirt so she would not be naked when emergency personnel arrived.  No one attempted to offer Ms. Caswell aid or stop the bleeding.

81.     Defendants Davis, Randolph, Presley, Ward, and Thornton were deliberately indifferent to Ms. Caswell's serious medical needs by failing to offer Ms. Caswell any aid after she delivered.

82.     After Defendant Cassi Peek finally approved Ms. Caswell's transport to the hospital, Ms. Caswell waited approximately 20 more minutes for the EMTs and the Fire Department to arrive, cut the cord, and transported her and her newborn son to Gadsden Regional. Defendants Davis, Randolph, Presley, Ward, Thornton, and John or Jane Doe 2 did not provide her with any medical care during the wait.  Ms. Caswell was still bleeding when the emergency personnel arrived.

83.     Upon arrival at Gadsden Regional, medical personnel noted that Ms. Caswell had a "large amount" of bleeding and that the sheet under Ms. Caswell was saturated with blood "from her shoulders to her feet."  Medical personnel also noted that Ms. Caswell was passing at least several golf ball-sized clots at the time of her arrival to the emergency room.

84.     At the hospital, Ms. Caswell and her newborn son finally received medical care. Medical personnel from Gadsden Regional assisted Ms. Caswell as she delivered her placenta. They noted that she had already lost approximately 500 cc of blood during her delivery.  Even at the hospital, Ms. Caswell continued to bleed heavily, saturating one pad with blood every hour

and passing large blood clots. As a result, Gadsden Regional staff admitted Ms. Caswell for two nights to monitor her and to provide her two iron transfusions to address her blood loss.

85.     Ms. Caswell was eventually diagnosed with a placental abruption, a condition in which the placenta splits or detaches from the womb, causing blood loss and intense pain. The attending physician at the hospital told Ms. Caswell that her blood loss and severe pain was due to the placental abruption. Hypertension and advanced maternal age are risk factors for placental abruption.[9] ECDC medical staff had Ms. Caswell's medical records and were aware of these diagnoses. *See supra* ¶¶ 34, 47.

86.     The experience of being forced to deliver her baby while standing alone in the shower at ECDC was incredibly traumatic for Ms. Caswell, to the degree that she felt increased symptoms of depression for the six months following her delivery, a time when the risk for postpartum depression is especially high.

87.     Through their actions and inactions, Defendants Dillard, Lopez, Presley, Ward, Randolph, McIntyre, Davis, King, Thornton, and John or Jane Doe 2 violated Ms. Caswell's constitutional rights by forcing her to endure an excruciatingly painful labor without adequate pain medication or medical treatment and ultimately forcing her to deliver her son without medical assistance, leading to a severe complication in the form of a placental abruption and significant blood loss, along with psychological injury.

### iv.     Defendants Denied Ms. Caswell Adequate Postpartum Care

88.     After two days in the hospital, Ms. Caswell returned to ECDC. Following the delivery of her son, Ms. Caswell felt agonizing pain and soreness throughout her body.

---

[9]     Yinka Oyelese, M.D. & Cande V. Ananth, M.D., M.P.H., *Placental Abruption*, 108 J. OBSTETRICS & GYNECOLOGY 1005 (2006).

89.     Despite experiencing an extremely traumatic birth merely days before, ECDC staff again required Ms. Caswell to sleep on a single thin mat on the floor due to a stated lack of beds. Ms. Caswell asked multiple ECDC staff members, including, but not limited to, Defendants McIntyre and Randolph, for additional mats to sleep on due to her pain.  She understood from other people detained at the facility that according to ECDC policy, ECDC staff were supposed to provide pregnant and postpartum women with three mats, not just one.  An ECDC staff member responded that it was "not [their] place to make [Ms. Caswell] comfortable."

90.     Despite Ms. Caswell's requests, ECDC staff also failed to provide her with access to sanitary pads for her vaginal bleeding following her delivery.  As a result, she was forced to rip up a T-shirt to soak up her bleeding during her postpartum recovery.

91.     While at Gadsden Regional, Ms. Caswell was prescribed Ibuprofen to manage her severe pain resulting from the needless complications she experienced from her delivery.  Ms. Caswell requested access to her prescribed Ibuprofen on a nearly daily basis, including from Defendants Page, King, Dillard, McIntyre, Holliday, and Jane Doe 1.  However, these Defendants and other ECDC staff refused to provide Ms. Caswell with her prescribed pain medication.

92.     As noted above, ECDC officials also for a time continued to refuse to provide Ms. Caswell with consistent access to her prescribed psychiatric medication to treat her depression and anxiety.  Ms. Caswell was experiencing severe depression, exacerbated by her traumatic labor and delivery, postpartum pain, lack of access to her medication, and separation from her newborn baby. *See supra* ¶¶ 36–43.

93.     Ms. Caswell filed multiple grievances documenting her mistreatment, including that she was sleeping on the floor and did not have access to her prescribed medication.  Defendants ignored these grievances.

94.    Defendants Page, McIntyre, and Holliday were aware that Ms. Caswell was recovering from a physically traumatic birth for which she was prescribed pain medication and that she was sleeping on the floor. They were deliberately indifferent to Ms. Caswell's serious medical needs by ignoring her requests for access to her physician-prescribed medication, additional floor mats, or a bed. Defendants' actions and inactions violated Ms. Caswell's constitutional rights because she was forced to endure a painful recovery from a traumatic birth without adequate access to prescribed pain and psychiatric medication and without a bed.

### v.    Defendants Denied Ms. Caswell Access to a Breast Pump

95.    While at Gadsden Regional, Ms. Caswell was prescribed a breast pump. Expressing breastmilk to feed her son was extremely important to Ms. Caswell, as it is to many mothers. She had breastfed her other children not born at ECDC and believed it created a special bond and provided her children with unique health benefits.

96.    Despite her prescription, ECDC officials refused to provide Ms. Caswell with a breast pump, thus failing to meet her diagnosed medical need for one. Among others, Ms. Caswell asked Defendants Page, Dillard, Presley, McIntyre, and Holliday for access to a breast pump and was denied without explanation. ECDC staff told Ms. Caswell only that "Etowah County doesn't do that." When Ms. Caswell told Defendant Page about the pain she was experiencing and asked for access to a breast pump, he told her, "There isn't anything I can do."

97.    Because of her lack of access to a breast pump, Ms. Caswell experienced extreme discomfort, pain, clogged milk ducts, inflammation in her breasts, and a fever—all symptoms of

mastitis.[10]  These symptoms lasted nearly a month following her delivery and inhibited her ability to perform daily activities or sleep.

98.     Ms. Caswell attempted to hand express her breastmilk while in her cell, but these efforts were ineffective.  She would regularly request to take a shower, as she found that the warm water would help her express her breastmilk and provide some relief from the engorgement and pain.  Despite Ms. Caswell crying and begging to be allowed access to a shower due to the pain, ECDC staff, including Defendant Holliday, regularly denied her requests.

99.     ECDC staff, including the individually named Defendants, also did not provide Ms. Caswell with nursing pads to help absorb her leaking breastmilk.  Consequently, she often leaked breastmilk onto her jail uniform.

100.    ECDC staff's refusal to allow Ms. Caswell to express her breastmilk caused emotional and physical pain.  She felt ongoing depression and enormous frustration during this period.

101.    Ms. Caswell filed a grievance form related to her pain from not being able to express her breastmilk.  She did not receive any response to her grievance.

102.    Defendants, including Defendants Page, Dillard, Presley, McIntyre, and Holliday, were aware that Ms. Caswell was recovering from a physically traumatic birth, that she was experiencing intense pain and engorgement due to the inability to express breastmilk following the birth, and that her doctor had prescribed a breast pump for her to use to express her breastmilk and prevent infection.  Even absent a prescription, Ms. Caswell's reports of pain and her symptoms of

---

[10]     Mastitis is an infection or inflammation of the breast tissue that often affects women who are producing breastmilk, particularly those who experience blocked milk ducts or inadequate drainage of their breastmilk.  Mastitis can cause breast pain, redness, as well as flu-like symptoms, including body aches and fever.  *See* Johns Hopkins Medical, *Mastitis*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/mastitis (last visited Oct. 12, 2023).

mastitis made her medical need for a breast pump obvious, such that Defendants showed deliberate indifference to her serious medical need by ignoring her requests for access to a breast pump and her requests for nursing pads.   Defendants' actions and inactions violated Ms. Caswell's constitutional rights because she was forced to endure painful sensitivity from engorgement, along with a fever, inflammation, clogged milk ducts, and burning pain, as well as being deprived of the opportunity to express breastmilk for her son.

### vi.   Ms. Caswell Made Repeated Requests for Assistance and Medical Care

103.    Over the course of her pregnancy and postpartum recovery, Ms. Caswell made numerous verbal requests and formal written requests for appropriate care, including but not limited to, regular prenatal appointments and access to her prescribed medications.   Additionally, Ms. Caswell filled out multiple grievance forms.   She never received a response to any of her grievance forms.

104.    Ms. Caswell does not know what happened to her grievance forms, who ultimately received the forms, or even whether they were reviewed.   She was not informed whether an appeal process was in place or, if there was, how she could request an appeal.

105.    At no time, including upon booking and entry to ECDC, did Defendants ever provide Ms. Caswell with a grievance policy or an inmate handbook describing how to fill out a grievance form or how to submit an appeal if a grievance form is ignored, denied, or deliberately destroyed by ECDC staff.   Numerous other people detained at ECDC likewise report never having been provided with any grievance policy or inmate handbook.   Ms. Caswell and other people detained at the facility only learned about the existence of grievance forms through word of mouth from other detainees, rather than from ECDC staff.

106.    While she was in labor, Ms. Caswell made numerous and continuous emergency verbal pleas for help and to be taken to the hospital.  ECDC staff ignored these requests again and again, even after it became clear her delivery was imminent.

107.    Defendant Dillard told Ms. Caswell after her delivery that there was nothing that Ms. Caswell could do to seek redress, stating that she "would never get anything out of it."  She also told Ms. Caswell that she did not deserve her baby.

108.    On multiple occasions when Ms. Caswell requested a grievance form, correctional officers refused to provide her with one or refused to sign her completed form, rendering it incomplete.  ECDC staff told Ms. Caswell that she should not file grievances, because the staff "doesn't like to deal with it," implying that anyone who filed a grievance was at risk of retaliation from staff.  Ms. Caswell and numerous other people detained at the facility have repeatedly seen ECDC staff, including correctional officers and sergeants, tear up and throw submitted grievance forms directly in the trash.  On the multiple occasions where Ms. Caswell submitted grievance forms, ECDC staff never provided a single response—let alone a proposed remedy or a denial. Numerous other people detained at the facility likewise have never received a response to their submitted grievance forms, creating the widespread impression throughout ECDC that the grievance process is in practice unavailable to detained persons.

109.    On information and belief, ECDC staff dispose of any grievance they deem incomplete because no ECDC staff member would agree to sign it.  In that scenario, the grievance is never entered into a grievance log, and the grieving person is never notified that their grievance was considered incomplete and thus rejected.  ECDC staff likewise dispose of any grievance that they deem frivolous.  Again, a grievance deemed frivolous is never entered into a grievance log, and the grieving person is never notified that their grievance was considered frivolous and thus

rejected.  Accordingly, if ECDC staff reject a grievance for being either incomplete or frivolous, the grieving person remains unaware of the rejection or the possibilities for appeal.  This lack of awareness is particularly problematic given that people detained at ECDC are never provided an inmate handbook or grievance policy.

### B.     Defendants' Conduct, Policies, Customs, and Practices Caused Ms. Caswell Needless Suffering and Injury

110.    Because of Etowah County's unusually high rate of detaining pregnant and postpartum women, it was particularly foreseeable and plainly obvious that Defendants' deliberate indifference to the serious medical needs of such people would lead to breaches of care and needless pain, suffering, and injuries.  Nearly half of all pregnancy-related arrests throughout the United States from 2006 to 2022 took place in Alabama,[11] and Etowah County far outpaces any other large county in the state and country when it comes to the arrest and pretrial incarceration of pregnant and postpartum women for pregnancy-related charges.[12]  As one media report put it, "No county does more to locate, jail and keep new mothers behind bars."[13]

111.    Moreover, until September 2022, Etowah County, unlike other Alabama counties, singled out pregnant and postpartum women arrested on chemical endangerment charges for uniquely onerous bond conditions that kept them detained pretrial for months on end, in contrast to most people arrested on low-level drug charges who would ordinarily pay a smaller bond to

---

[11]    PURVAJA S. KAVATTUR, ET AL., PREGNANCY JUSTICE, THE RISE OF PREGNANCY CRIMINALIZATION: A PREGNANCY JUSTICE REPORT 17, 19 (2023).

[12]    *See* William Thornton, *Etowah County DA, Sheriff Pledge Greater Cooperation on Chemical Endangerment Cases*, AL.com (May 20, 2013), https://www.al.com/east-alabama/2013/05/etowah_county_da_sheriff_pledg.html; Marisa Iati, *Pregnant Women Were Jailed Over Drug Use to Protect Fetuses, County Says*, Wash. Post (Sept. 8, 2022), https://www.washingtonpost.com/nation/2022/09/08/pregnant-women-drugs-jail/ (noting that there have been over 150 arrests for criminal endangerment in Etowah County in the past decade).

[13]    Yurkanin, *One Alabama County Cracked Down on Pregnant Drug Users. 10 Years Later, Has it Gone Too Far*, *supra* note 1.

secure their pretrial release.[14]   Accordingly, Etowah County's need to provide medical care to pregnant and postpartum women jailed pretrial for weeks or months is not a rare or isolated incident as it is in most county jails; it is a routine and ongoing necessity.

112.    Defendants Etowah County, Doctors' Care, CED, Horton, Keith Peek, Buck, Page, and Cassi Peek have established policies, customs, and practices concerning medical care for people detained at ECDC that reflect deliberate indifference to detained individuals' serious medical needs.   Those policies, customs, and practices include delaying, denying, or providing plainly inadequate medical care for pregnant and postpartum women.   As detailed below, relevant policies, customs, and practices include, but are not limited to, limiting or restricting pregnant women from receiving regular prenatal and postnatal care; prohibiting pregnant and postpartum women from receiving certain medications, including critical psychiatric medications for which they have valid prescriptions; denying postpartum women access to breast pumps; and failing to send pregnant women to external medical providers or provide adequate medical care within ECDC, even in emergency and life-threatening situations, including during labor and delivery.

113.    Defendants Etowah County, Doctors' Care, Horton, Keith Peek, Buck, Page, and Cassi Peek had knowledge and were on notice that the policies, customs, and practices of delaying or denying necessary medical care for pregnant and postpartum women detained at ECDC were harmful to the health and wellbeing of the pregnant and postpartum women in their custody and their growing babies.   Defendants had such knowledge from various sources, including complaints

---

[14]      *Id.*; Amy Yurkanin, *Alabama County Ends Practice of Keeping Pregnant Women in Jail Awaiting Rehab Beds*, AL.com (Sept. 26, 2022), https://www.al.com/news/2022/09/alabama-county-ends-practice-of-keeping-pregnant-women-in-jail-until-trial.html; Amy Yurkanin, *Pregnant Women Held for Months in One Alabama Jail To Protect Fetuses from Drugs*, AL.com (Sept. 8, 2022), https://www.al.com/news/2022/09/pregnant-women-held-for-months-in-one-alabama-jail-to-protect-fetuses-from-drugs.html.

and grievances filed by people detained at the facility, communications from ECDC staff, media reports, their own observations, and common sense.

114.    Upon information and belief, these constitutionally deficient policies, customs, and practices regarding medical care at ECDC were created and implemented by the agreement between Etowah County and Doctors' Care.  As described below, for years under Doctors' Care's tenure as the medical contractor for ECDC, there have been documented deprivations of adequate medical care for detained persons in ECDC, including delay and denial of adequate medical care for pregnant and postpartum women detained at ECDC.

115.    Defendant Etowah County caused or contributed to these grossly deficient policies, customs, and practices, including by failing to provide adequate funds for medical treatment for persons in its custody at ECDC and by continuing to retain Doctors' Care as the medical contractor for ECDC despite knowledge of Doctors' Care's policies, customs, and practices.

        **i.**      **Defendants Have a History of Failing to Provide Adequate Medical Care for People Who Are Detained at ECDC While Pregnant or Postpartum**

116.    Defendants have a history of failing to provide adequate medical care for pregnant and postpartum women detained at ECDC.  In recent years, numerous pregnant and postpartum women at ECDC have experienced and continue to experience inadequate medical care and deliberate indifference to their serious medical needs.

117.    Indeed, Ms. Caswell's experience during and following her 2021 pregnancy was preceded by a pattern of similar constitutional violations against multiple other women which took place over recent years, including against Ms. Caswell herself in 2019.   These similar constitutional violations include failing to provide prescribed medication, failing to provide adequate prenatal care, failing to transport to the hospital or provide adequate medical care during pregnancy-related emergencies such as labor and delivery, failing to provide adequate postpartum

care, and failing to provide breast pumps.  This pattern was known to Defendants Horton, Keith

Peek, Buck, Page, and Cassi Peek, who took no steps to end it and therefore allowed Ms. Caswell

to fall victim to the pattern again in 2021.

> a.   **Defendants Have a Pattern of Failing to Provide Prescribed Medication to Pregnant and Postpartum Women in Their Custody**

118.   Defendants have a pattern of failing to provide prescribed medication to pregnant

and postpartum women in their custody.  In fact, Ms. Caswell herself suffered such constitutional

violations when she was detained at ECDC in 2019 while pregnant.

119.   Shortly before Ms. Caswell's 2019 arrest, she was prescribed psychiatric

medications to treat her bipolar disorder and schizophrenia (Seroquel), along with her anxiety and

depression (Zoloft).  At the time of Ms. Caswell's arrest in January 2019, she was still prescribed

and taking Seroquel and Zoloft to manage her mental health conditions.

120.   During the booking process following Ms. Caswell's arrest, ECDC staff informed

Ms. Caswell that she would not be permitted to continue taking her Seroquel and Zoloft

prescriptions, ostensibly because she was pregnant.  There was no medical justification for this.

121.   As a result of being deprived of her necessary psychiatric medication, Ms. Caswell

began to experience suicidal ideation.  Ms. Caswell contacted ECDC staff, expressing that she

needed her prescribed Seroquel and Zoloft.  ECDC staff ignored her request.  On or about

January 28, 2019, Ms. Caswell attempted suicide by cutting her wrists with a razor while in ECDC.

122.   Ms. Caswell was subsequently admitted to Gadsden Regional for treatment.  While

at Gadsden Regional, the obstetrician treating Ms. Caswell confirmed that Ms. Caswell should

continue to take her prescribed Seroquel and Zoloft throughout her pregnancy, and that the

continuing use of these medications would not pose any harm to her pregnancy.  It was only after

this harrowing suicide attempt that ECDC staff permitted Ms. Caswell to continue to take her prescribed Seroquel and Zoloft for the remainder of her 2019 pregnancy.

123.    By failing to take remedial measures after incidents like Ms. Caswell's in which ECDC officials inappropriately and dangerously refused to administer prescribed medication, Defendants Horton, Keith Peek, Buck, Page, and Cassi Peek showed deliberate indifference to the constitutionally suspect consequences that resulted and therefore bear responsibility for the later unconstitutional denial of Ms. Caswell's prescribed medication in 2021.

124.    Other women who were detained at ECDC while pregnant or postpartum in the three years prior to the events that give rise to Ms. Caswell's complaint also report that ECDC staff failed to provide them with consistent access to their prescription medication.  ECDC staff told multiple pregnant women they could not have psychiatric medications because they were pregnant.

125.    Other women were denied critical pain medication.  For example, E.C. was arrested in June 2019, and, for the duration of her time at ECDC, was not given access to pain medication, including the Percocet that she had been prescribed for pain management following her cesarean surgery just a week prior to her arrest.

>    **b.    Defendants Have a Pattern of Failing to Provide Adequate Prenatal Care to Pregnant Women in Their Custody**

126.    Defendants have a pattern of failing to provide adequate prenatal care to pregnant women in their custody.  Ms. Caswell herself suffered such constitutional violations when she was detained at ECDC in 2019 while pregnant, and at least four other women who were pregnant while detained at ECDC had similar experiences prior to the 2021 events that form the basis of Ms. Caswell's claims.

127.    Ms. Caswell entered ECDC custody on January 2, 2019, following an arrest on a chemical endangerment charge.  At the time, she was approximately one month pregnant with a high-risk pregnancy due to her diagnosed hypertension, advanced maternal age, and history of abnormal pap smears.  At all relevant times, Defendants were aware that Ms. Caswell was pregnant, and knew or ought to have known that Ms. Caswell's pregnancy was high risk.

128.    Although biweekly or weekly prenatal care appointments are the standard recommendation for women in their third trimester, ECDC staff permitted Ms. Caswell to attend only a single prenatal care appointment during this period of her high-risk pregnancy.  Prenatal appointments were particularly important for Ms. Caswell given her high-risk pregnancy and high blood pressure diagnoses.

129.    Ms. Caswell asked ECDC staff to take her to her required prenatal appointments and filled out a medical request form for her prenatal appointments.  Still, ECDC staff did not regularly take Ms. Caswell to her appointments.  Ms. Caswell also submitted a grievance form documenting this substandard care.  She did not receive a response.  In desperation, Ms. Caswell wrote a letter directly to Defendant Horton to demand that she be taken to her prenatal appointments.  Again, ECDC staff and Defendant Horton failed to respond.

130.    Ms. Caswell was also raped during her 2019 pregnancy while in booking at ECDC. She immediately reported the rape to multiple ECDC officials, who accused her of lying, even after they reviewed camera footage confirming her account.  Ms. Caswell was taken to Gadsden Regional, where medical staff documented physical harms she had suffered during the attack, including bruising on her vagina and inner thighs, and ordered Ms. Caswell, who was approximately two months pregnant, to attend a follow-up appointment within 30 days to check on her recovery.  ECDC staff refused to take her to the follow-up appointment.  Ms. Caswell

34

submitted a grievance form regarding the sexual assault and ECDC officials' callous response, but she never received a response and no one ever informed her whether the perpetrator was charged.

131.    At least three other women who were detained at ECDC while pregnant or postpartum prior to Ms. Caswell's 2021 experience report that the jail failed to provide adequate prenatal care.  Those women are A.S., E.W., and K.W.  Like Ms. Caswell, K.W. had a high-risk pregnancy.

132.    A.S. was arrested in September 2019 while five months pregnant.  ECDC staff also failed to take A.S. to regular prenatal care appointments, even though she was in the latter part of her pregnancy.  Similarly, E.W. was arrested in September 2018 while eight and a half months pregnant.  When she arrived at ECDC, E.W. asked to be taken to a prenatal care appointment and filled out a medical request form for a prenatal appointment—ECDC staff refused her request.

133.    E.W., like Ms. Caswell, had to sleep on a mat on the floor because another woman was sleeping on the bottom bunk in her cell.  ECDC staff told E.W. that the jail does not allow pregnant women to sleep on the top bunk.  ECDC staff refused E.W.'s requests for a proper sleeping arrangement, informing her that she would not receive anything better than a single mat on the floor because "it's jail."

134.    K.W., who was arrested in July 2019 at four months pregnant, was not taken to regular prenatal appointments, despite submitting multiple requests for appointments and reporting that she was experiencing pressure in her abdomen.  ECDC staff waited over a month to take K.W. to her first prenatal care appointment.

135.    By failing to take remedial measures after incidents like these in which Jail officials failed to monitor the health of pregnant women adequately and to meet their medical needs, especially for high-risk pregnancies, Defendants Horton, Keith Peek, Buck, Page, and Cassi Peek

showed deliberate indifference to the constitutionally suspect consequences that resulted and therefore bear responsibility for the later unconstitutional failure to provide adequate prenatal care to Ms. Caswell in 2021.

> **c.**   **Defendants Have a Pattern of Failing to Provide Adequate Medical Care or Transport to the Hospital During Pregnancy-Related Emergencies, Including Labor and Delivery**

136.   Defendants have a pattern of failing to provide adequate medical care, including a pattern of failing to transport people to the hospital, during pregnancy-related emergencies such as labor and delivery.   At least three other women who were pregnant while detained at ECDC suffered such constitutional violations similar to Ms. Caswell's in the three years prior to the 2021 events that form the basis of her claims.   Those women are K.W., A.S., and E.W.

137.   As explained above, K.W. was arrested in June 2019 when she was approximately four months pregnant.   *See supra* ¶ 134.   Shortly after arriving at ECDC, K.W. began experiencing heavy vaginal bleeding and abdominal cramping.   Defendant Page approved K.W.'s transport to Gadsden Regional, where she was informed that she had a high-risk pregnancy and had experienced a threatened miscarriage.   K.W.'s discharge instructions—provided to ECDC medical staff—directed K.W. to return to the hospital if she experienced either vaginal bleeding or if her water ruptured.   Two days later, K.W. felt her water break and requested urgent medical attention. Defendant Dillard checked K.W.'s vitals and expressed disbelief—without basis—that K.W.'s water had broken.   K.W. pleaded to be taken to the hospital, but Defendant Page rejected the request.   K.W. continued leaking amniotic fluid and experiencing vaginal bleeding.   ECDC medical staff denied each of her repeated requests to go to the hospital, despite having received discharge instructions that explicitly stated that K.W. should return if she experienced either condition.

138.     When ECDC staff finally took K.W. to her follow-up appointment—five days after she reported her water breaking—her OB/GYN confirmed that her water had indeed broken five days earlier, ordered her immediate transport to Gadsden Regional, and diagnosed her with oligohydramnios—the severe loss of amniotic fluid—and preterm premature rupture of membranes ("PPROM"), which occurs when the amniotic membrane surrounding a fetus breaks before 37 weeks of pregnancy, posing serious risk of infection.[15]   At the hospital, medical staff placed K.W. on antibiotics, which could and should have been started days earlier by ECDC medical staff.  Due to the high risks associated with her diagnosed oligohydramnios and PPROM, K.W. was moved to UAB and placed on bed rest for approximately three to four weeks.  K.W. ultimately had a stillbirth and, after her placenta failed to properly detach, she hemorrhaged a life-threatening amount of blood, requiring a transfusion.  Her doctors at UAB informed her that her baby could have survived if she had been taken to the emergency room earlier when her water initially broke.

139.     A.S. was arrested on a chemical endangerment charge in September 2019 when she was approximately five months pregnant and went into labor while in her cell at ECDC in January 2020.   In the afternoon or early evening, she began to experience contractions.   A.S. told correctional officers that she was in labor, but they, in response, only told her that ECDC medical staff "didn't have time" to check on her.  A.S. later recounted that the pain of her unmedicated labor was the most excruciating pain of her life.  No one from the medical unit came to assist A.S., provide her with pain medication, or take her to the hospital.  Rather, people in adjacent cells—

---

[15]     Risks of PPROM include early delivery of the baby and serious infection of the placental tissues, which can be very dangerous for both the mother and the baby.  *See ACOG Practice Bulletin: Prelabor Rupture of Membranes*, 136 OBSTETRICS & GYNECOLOGY, 135 OBSTETRICS & GYNECOLOGY e80, e81 (2020) ("The most significant risks to the fetus after preterm PROM are complications of prematurity" and include "[r]espiratory distress," and "an increased risk of neurodevelopmental impairment," as well as other complications such as sepsis.).

including Ms. Caswell— began timing A.S.'s contractions and attempted to support her during her labor.  After laboring unassisted in her cell for hours, a rover got A.S. from her cell and moved her to the medical unit.  A.S. was so advanced in her labor that there was not sufficient time to transport her to the hospital for her delivery.  A.S. ultimately gave birth on the floor of the jail medical unit without medication.  She had never been pregnant before and thus had never experienced labor or delivery.  She experienced intense fear while laboring in her cell without medical assistance.

140.    E.W. also went into labor in September 2018 while detained at ECDC.  She alerted at least five different correctional officers and deputies that she was in labor and needed to be taken to the medical unit.  Still, ECDC staff left E.W. to labor alone in the cell for hours without any assistance or any examination from medical staff.  After her pleas for help were ignored for hours, E.W.'s cellmate contacted her own mother, who then called ECDC about E.W.'s condition multiple times.  Only then did ECDC staff finally move E.W. to a cell in the medical unit, but they again left her there to continue to labor by herself, screaming in pain, audible to the entire medical unit.  The nurses expressed skepticism that her water had broken and left E.W. alone in her cell for at least an hour.  E.W. noticed that she was bleeding from her vagina, which was not a symptom she had experienced during the delivery of her older child.  She alerted the nurses, who finally examined her and told her that her cervix was not dilated, which E.W. knew was incorrect given the amount of time she had been in labor and the frequency of her contractions.  E.W. asked the nurses to be taken to the hospital nine or ten times.  Finally, approximately four hours after her examination, and long after E.W. first alerted ECDC staff to her ongoing labor, ECDC staff finally put E.W. in an ambulance to be taken to the hospital.  When E.W. arrived at the hospital, hospital staff confirmed that E.W. was seven centimeters dilated.  E.W. ultimately gave birth to her baby via cesarean surgery.

141.    By neglecting to take remedial measures after incidents like these in which ECDC officials failed to provide adequate medical care to women in active labor and failed to transport them to the hospital at the appropriate time, Defendants Horton, Keith Peek, Buck, Page, and Cassi Peek showed deliberate indifference to the constitutionally suspect consequences that resulted and therefore bear responsibility for the later unconstitutional failure to provide adequate medical care to Ms. Caswell in 2021.

### d.    Defendants Have a Pattern of Failing to Provide Adequate Medical Care to Postpartum Women Detained at ECDC

142.    Defendants have a pattern of failing to provide adequate medical care to people in their custody who are postpartum.  At least two women who were postpartum while detained at ECDC suffered constitutional violations similar to Ms. Caswell's in the three years prior to the 2021 events that form the basis of her claims.  Those women are E.W. and E.C.

143.    As described above, E.W. went into labor at ECDC in September 2018.  *See supra* ¶ 140.  When E.W. returned to the jail following her delivery, ECDC staff forced her to sleep on the floor.  Sleeping on the floor caused her physical pain and made her fear that her cesarean incision would reopen.  About a week after returning to the jail, E.W. recognized that her incision had become infected, as it was inflamed and pus was visible around the staples.  E.W. asked to be taken to the medical unit for the infection and submitted multiple request forms.  ECDC staff made her wait four days for an appointment with the medical unit while her infection worsened.  ECDC staff did not take E.W. to any follow-up postpartum medical appointments after her delivery.  E.W. also experienced vaginal bleeding for three weeks after she returned to ECDC.  The only pads she had were those the hospital had given her; when she requested additional pads, ECDC staff, including Defendant Dillard, refused her request.  E.W. bled through every pair of underwear she

had as a result, and, when she asked ECDC staff for additional pairs of underwear, E.W. was provided only with a disposable pair of gauze underwear.

144.    E.C. was arrested in June 2019, just nine days after she gave birth via cesarean surgery.  She had a large incision across her stomach and was still recovering from her surgery when she was booked, and she was still experiencing extreme pain.  Despite her condition, ECDC staff required E.C. to sleep directly on the concrete floor—without even a mat—for approximately nine days while she was held in booking, which exacerbated the pain she experienced from her recent surgery.  Another person detained in booking repeatedly told correctional officers that E.C. had just given birth and even offered to provide his own mat to E.C.  The correctional officers refused and forced E.C. to lie on the concrete floor the entire time she was in booking.  E.C. made numerous verbal requests to at least six different correctional officers about the conditions and extreme pain she faced while she was in booking, but none of them did anything to help her.  ECDC staff failed to provide E.C. with access to either medical request forms or grievance forms while she was in booking.  After being transferred from booking, E.C. filed a grievance stating that she had been mistreated during her surgery recovery, but she never received a response.

145.    Shortly after arriving at ECDC, E.C. noticed that she was bleeding heavily from her vagina and passing large blood clots.  She alerted ECDC staff to the bleeding and was finally taken to Gadsden Regional three days after her arrest.  At the hospital, the doctor told E.C. that the bleeding could be from straining and instructed her to follow up with her OB/GYN about the issue.  E.C. continued to bleed for approximately six weeks at ECDC and would bleed through up to six pads in an hour.  She repeatedly asked for more pads, but her requests were often ignored.  One correctional officer told her that she could only have three pads per day, even though additional pads were not available for purchase in the commissary.  ECDC staff also would not allow E.C.'s

family to bring her additional pads or underwear.  E.C. filed a grievance form about her lack of access to pads, but never received a response.  E.C. never received another examination for her vaginal bleeding.  For the duration of her time in ECDC, E.C. was not given access to pain medication, including the Percocet that she had been prescribed for pain management following her cesarean surgery roughly one week prior to her arrest.

146.    By refusing to take remedial measures after incidents like these in which ECDC officials failed to provide adequate medical care to postpartum women, Defendants Horton, Keith Peek, Buck, Page, and Cassi Peek showed deliberate indifference to the constitutionally suspect consequences that resulted and therefore bear responsibility for the later unconstitutional failure to provide adequate postpartum care to Ms. Caswell in 2021.

> **e.    Defendants Have a Pattern of Failing to Provide Breast Pumps to Postpartum Women in Their Custody**

147.    Defendants have a pattern of failing to provide breast pumps to postpartum women in their custody.  Ms. Caswell herself suffered such constitutional violations when she was detained at ECDC in 2019 while postpartum, and at least two other women who were postpartum while detained at ECDC had similar experiences prior to the 2021 events that form the basis of Ms. Caswell's claims.

148.    While in ECDC custody in January of 2019, Ms. Caswell gave birth to a baby boy at the University of Alabama Birmingham Women & Infants Center.  Following the delivery, Ms. Caswell was transported back to ECDC.  At the hospital, Ms. Caswell's doctors told her that she should use a breast pump to provide breastmilk to her baby while in the jail.

149.    Ms. Caswell verbally requested a pump to express her breastmilk from ECDC staff, including medical staff, on multiple occasions, but no one provided her with one.  She submitted multiple medical request forms for a breast pump.  ECDC's medical unit responded that it did "not

have the supplies for breastfeeding" or "a way to store breastmilk."  Ms. Caswell even offered to have someone outside the jail arrive to pick up her milk, but an ECDC staff member in the medical unit told Ms. Caswell that it was not possible for her to use a breast pump.

150.    At least two other women who were postpartum at ECDC were similarly denied breast pumps in the three years prior to the 2021 events that form the basis of Ms. Caswell's claims. They are E.W. and E.C.  E.W. also requested access to a pump to express her breastmilk, and ECDC refused to provide one.  E.W.'s breasts became extremely painful and engorged from the inability to express her breastmilk.  ECDC also refused to provide E.C. with either a breast pump or breast pads to absorb her breastmilk.  As a result, E.C. experienced extreme pain, sensitivity, inflammation, clogged milk ducts, and nausea.

151.    By failing to take remedial measures after repeated incidents like these in which ECDC officials failed to provide medically necessary breast pumps to postpartum women, Defendants Horton, Keith Peek, Buck, Page, and Cassi Peek showed deliberate indifference to the constitutionally suspect consequences that resulted and therefore bear responsibility for the later unconstitutional failure to provide a pump to Ms. Caswell in 2021.

> **ii.    Defendant Etowah County Woefully Underfunds ECDC Medical Care, and Doctors' Care Is Financially Disincentivized from Seeking Medical Services for People Detained at ECDC**

152.    Between 1997 and 2022, ECDC housed Immigration and Customs Enforcement ("ICE") detainees as a portion of its population.  Prior to 2022, ICE provided payments to ECDC for housing ICE detainees in the facility.  Notably, as of 2016, ECDC charged ICE a per diem for each detainee significantly lower than the national average—just $45 per detainee per day, as compared with the nearly 3x larger national average of $164 from 2016.[16]  These payments for

---

[16]    SOUTHERN POVERTY LAW CENTER, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, & ADELANTE ALABAMA WORKER CENTER, SHADOW PRISONS: IMMIGRATION DETENTION IN THE SOUTH 52 (2016).

ICE were only intended to cover the medical costs of the ICE detainees in ECDC's care.  But according to public statements by Defendant Sheriff Horton in 2022, while ICE detainees "occupied less than 20 percent of the facility," the abnormally low daily per diem payments from ICE "made up 100 percent of the medical budget" for the entire facility, including non-ICE detainees.[17]  Upon information and belief, these statements from Defendant Sheriff Horton confirm that Etowah County's medical care budgetary allocations were insufficient to provide the necessary medical care for the detained population at ECDC and contributed to Defendants' shocking deliberate indifference toward Ms. Caswell.

153.    Further, Etowah County's operative contract with Doctors' Care during the relevant period (the "Doctors' Care Contract") provided that Doctors' Care received a base payment of $2,165,300 per year.  The contract specifies, however, that Doctors' Care is "responsible for payment of all medical services up to a cap of $240,000 annually."  The categories of capped care include "pharmacy," "specialty services," and "hospitalization services."  Any costs for these services within the cap thus came directly out of Doctors' Care's profits.  The contract therefore disincentivized Doctors' Care from obtaining medications, specialty services like prenatal appointments, or hospitalizations for people detained at ECDC.

154.    Further, the Doctors' Care Contract provided that Doctors' Care was responsible "at its own cost" for "emergency medical care, as medically necessary, to inmates through arrangements to be determined by DCP with local health providers."  This arrangement not only disincentivized Doctors' Care from seeking emergency medical services for people detained at ECDC, but also gave Doctors' Care full discretion to approve (or disapprove) emergency medical services.

---

[17]      Emma Kirkemier, *Etowah County Detention Center budgets in-house* healthcare, Gadsden Messenger (Aug. 18, 2022), https://gadsdenmessenger.com/etowah-county-detention-center-budgets-in-house-healthcare/.

155.    Under the terms of the contract, Doctors' Care was also responsible for the provision of "medical, dental, mental health, technical and support personnel for the rendering of healthcare services to inmates at the jail . . . ."  The contract disincentivized Doctors' Care from providing adequate staffing, as payments to these staff came directly from the base compensation provided to Doctors' Care, thus reducing their profits.  Further, the Doctors' Care Contract does not provide any terms regarding the minimum level of staffing required, instead leaving discretion for adequate staffing fully with Doctors' Care, which had a direct incentive to minimize the staff.

### iii.    Defendants Have Been on Notice about Medical Care Deficiencies at ECDC for Years

156.    In the years leading up to and during the time that Ms. Caswell was incarcerated at ECDC, the facility was subject to numerous complaints regarding its conditions, including reports that the provision of medical care in the facility was wholly inadequate.

157.    In 2015, the U.S. Department of Human Service's Office for Civil Rights and Civil Liberties ("CRCL"), which is responsible for reviewing complaints of civil rights violations at ICE facilities, sent ICE a recommendations memorandum detailing the numerous complaints CRCL had received regarding ECDC.[18]  Upon information and belief, the Etowah County Sheriff's Office, Defendant Etowah County, and Defendant Doctors' Care were aware of the conditions and incidents of inadequate medical care documented in these reports.

158.    While the publicly-available version of this memorandum contains redactions, it notes that ECDC had received "serious allegations in the areas of medical and mental health care."

---

[18]    Memorandum from Megan H. Mack, Officer, U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties, and David J. Palmer, Acting Associate General Counsel, U.S. Department of Homeland Security Office of General Counsel to Sarah Saldana, Director, U.S. Immigration and Customs Enforcement, and Gwendolyn Keyes Fleming, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, "Recommendations Regarding Ongoing Issues and Open Complaints at the Etowah County Jail" (May 28, 2015).

159.   A November 2016 report authored by the Southern Poverty Law Center, National Immigration Project of the National Lawyers Guild, and Adelante Alabama Worker Center detailed similar complaints of inadequate medical care.[19]   The report describes the difficulty that numerous people detained at ECDC faced in obtaining prompt medical attention at ECDC.

160.   ICE published additional inspection reports regarding the conditions at ECDC in both December 2016[20] and March 2018,[21] both of which detailed additional complaints about inadequate medical services at ECDC, including delays in receiving evaluations for medical needs and lack of access to psychiatric medications.   In March 2022, following these reports of inadequate conditions and medical care, ICE discontinued use of ECDC altogether, citing the facility's "long history of serious deficiencies."[22]

161.   Shockingly, the appalling conditions and inadequate medical care at ECDC have also been documented on the A&E's reality series, "60 Days In," which was filmed at the facility in 2019 and aired in 2020.   The premise of "60 Days In" involves volunteers who are incarcerated as undercover detainees at detention facilities for 60 days.   Upon information and belief, Defendant Etowah County, Defendant Sheriff Horton, and Defendant Chief Keith Peek permitted A&E to film this reality show at the facility.   In a press release, A&E described ECDC as "one of the worst

---

[19]   SOUTHERN POVERTY LAW CENTER, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, & ADELANTE ALABAMA WORKER CENTER, *supra* note 16, at 55–58.

[20]   ICE OFFICE OF DETENTION OVERSIGHT COMPLIANCE INSPECTION, COMPLIANCE INSPECTION FOR THE ETOWAH COUNTY JAIL (2016).

[21]   Memorandum from Cameron Quinn, Officer, U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties, and Susan Mathias, Assistant General Counsel, U.S. Department of Homeland Security Office of General Counsel, to Thomas D. Homan, Deputy Director and Senior Official Performing the Duties of the Director, ICE, and Michael P. Davis, Acting Principal Legal Advisor, ICE,, "Recommendations Regarding Ongoing Issues and Open Complaints at the Etowah County Jail" (May 28, 2015).

[22] Press Release, U.S. Immigration and Customs Enforcement, ICE to Close Etowah Detention Center (March 25, 2022), https://www.ice.gov/news/releases/ice-close-etowah-detention-center.

facilities the series have ever seen."[23]   Indeed, Defendant Horton stated on the program that "this jail is really broken" and "the Etowah County Jail is in a dire situation."[24]

162.    This description is borne out by the footage captured, which depicts the callous indifference of ECDC staff towards those in their care.  For example, individuals on the show explained that ECDC staff confiscate women's undergarments during booking but fail to supply them with bras, underwear, or menstrual products, leading women to construct makeshift supplies out of torn-up sheets and T-shirts, just as Ms. Caswell was forced to do to manage her postpartum vaginal bleeding.  The series also depicts detained individuals explaining that ECDC refuses to give them their prescribed mental health medications, and that in the absence of such medication, they resort to illegal contraband drugs.

## Count I
### 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs (Fourteenth Amendment)
### Against Defendants Cassi Peek, Page, Dillard, Lopez, Ward, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, Jane Doe 1, and John or Jane Doe 2

163.    Ms. Caswell re-alleges and incorporates by reference paragraphs 33–109 above.

164.    The Constitution requires that officials ensure that detained individuals receive adequate food, clothing, shelter, and medical care.  Deliberate indifference to the serious medical needs of a person detained pretrial violates the Due Process Clause of the Fourteenth Amendment. Defendants named in Count I, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Ms. Caswell in violation of the Fourteenth Amendment.

165.    As described above, Defendants had knowledge of Ms. Caswell's medical needs and the seriousness of those needs, and they knew the risk of harm she faced if she did not receive

---

[23]      Press Release, A&E, A&E Announces Premiere of New Series 'Alaska PD' and the Return of 'The First 48' and '60 Days In' (Nov. 19, 2019).

[24]      *60 Days In: Season 6, Episode 1* (A&E television broadcast Jan. 2, 2020), https://www.aetv.com/shows/60-days-in/season-6/episode-1.

appropriate medical care.  Despite that knowledge, Defendants acted with deliberate indifference and failed to provide Ms. Caswell with proper medical care or access to medical care over the course of her pregnancy and postpartum recovery from March 16, 2021, to April 2022.  Ms. Caswell experienced unnecessary pain, suffering, and injury as a consequence.

166.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Ms. Caswell's rights.

167.    As described in paragraphs 34–43, Defendants Dillard, Lopez, Ward, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, and Jane Doe 1 were aware of Ms. Caswell's lawfully prescribed psychiatric medication and her mental health diagnoses, including bipolar disorder, post-traumatic stress disorder, depression, and anxiety.  Ms. Caswell's mental health diagnoses and her prescribed medications for the same were objectively serious medical needs.  Defendants had knowledge of the substantial risk of harm that would result from a failure to adequately treat this serious medical need yet acted with deliberate indifference to that need by failing to provide Ms. Caswell with consistent access to her prescribed psychiatric medication despite her repeated verbal and written requests for said medication.  Defendants' conduct caused Ms. Caswell physical and emotional injury.

168.    As described in paragraphs 44–50, Defendants Dillard, Lopez, Presley, McIntyre, and Holliday knew of Ms. Caswell's high-risk pregnancy and her need to obtain regular prenatal care, but were deliberately indifferent to that serious medical need by failing to take Ms. Caswell to regular, recommended prenatal appointments in the crucial last month of her pregnancy, despite her repeated verbal requests for said visits.  Defendants' conduct caused Ms. Caswell physical and emotional injury.

169.    Defendants Cassi Peek, Dillard, Lopez, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, and John or Jane Doe 2 knew that Ms. Caswell was in labor and experiencing a serious medical need.  As described in paragraphs 51–87 above, Defendants were deliberately indifferent to Ms. Caswell's serious medical need including by (i) failing to closely monitor and examine her following her amniotic fluid membrane rupture and failing to transport her to the hospital immediately to prevent infection; (ii) refusing to transport her to the hospital once she was in active labor; (iii) ignoring her calls for help and requests to be taken to the hospital and refusing to provide or obtain medical treatment for her; (iv) refusing her requests for an epidural and providing her with merely an ibuprofen and telling her to "deal with" her excruciating pain during approximately 12 hours of labor; (v) failing to assist her during delivery; and (vi) failing to provide her with medical attention while she was bleeding on the shower floor following her delivery, despite Ms. Caswell's repeated verbal pleas for medical assistance and to be transported to the emergency room.  Defendants' conduct caused Ms. Caswell physical and emotional injury.

170.    As described in paragraphs 88–94, Defendants Page, Dillard, Randolph, McIntyre, and King knew that Ms. Caswell was recovering from a physically traumatic birth, but were deliberately indifferent to her serious medical need by requiring her to continue sleeping on the floor and failing to provide her with access to a bed or access to sanitary pads for her vaginal bleeding following her delivery, despite her repeated verbal and written requests for said accommodations.  Defendants' conduct caused Ms. Caswell physical and emotional injury.

171.    As described in paragraphs 88 and 91, Defendants Page, King, Dillard, McIntyre, Holliday, and Jane Doe 1 knew that Ms. Caswell was recovering from a physically traumatic and painful birth but were deliberately indifferent to her serious medical need by failing to provide Ms.

Caswell with access to her prescribed pain medication despite her repeated verbal and written requests for said medication. Defendants' conduct caused Ms. Caswell physical and emotional injury.

172. As described in paragraphs 95–102, Defendants Page, Dillard, Presley, McIntyre, and Holliday knew that Ms. Caswell was recovering from a physically traumatic birth, that she was expressing breastmilk following the birth, that her attending OB/GYN had prescribed a breast pump to aid in expressing her breastmilk, and that she was experiencing pain and other symptoms of mastitis from her inability to pump. Defendants were deliberately indifferent to Ms. Caswell's serious medical need by failing to provide her access to a breast pump to express her breastmilk or medical treatment to deal with the pain from her inability to pump, despite her repeated verbal and written requests for assistance. Defendants' conduct caused Ms. Caswell physical and emotional injury.

173. Ms. Caswell's constitutional rights were violated as a direct result of the actions and inactions of Defendants named in this Count. These Defendants directly and proximately caused her physical and emotional injuries, and their conduct was motivated by evil motive or intent and involved reckless or callous indifference to Ms. Caswell's federally protected rights.

**Count II**
**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs (Fourteenth Amendment—Supervisory Liability)**
**Against Defendants Horton, Keith Peek, Buck, Page, and Cassi Peek**

174. Ms. Caswell re-alleges and incorporates by reference paragraphs 33–109 above.

175. The Constitution requires that officials ensure that detained individuals receive adequate food, clothing, shelter, and medical care. Deliberate indifference to the serious medical needs of a person detained pretrial violates the Due Process Clause of the Fourteenth Amendment.

Defendants named in Count II, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Ms. Caswell in violation of the Fourteenth Amendment.

176.    At all relevant times, Defendants named in this Count were supervisory officials for ECDC staff and were responsible for the creation, development, implementation, oversight, and supervision of policies, customs, and practices regarding medical care at ECDC, the training of correctional and medical staff on the provision of medical care, and the supervision and discipline of correctional staff and medical staff at ECDC who were responsible for providing people in the facility with medical care or access to medical care.

177.    As described above in paragraphs 110–162, incidents of delay or denial of medical care to pregnant or postpartum women of a similar nature to the incidents involving Ms. Caswell were not isolated events.  Instead, they were obvious, flagrant, rampant, and of a continued duration such that they constitute a history of widespread abuse.  As explained above in paragraphs 110–151, prior to the events giving rise to Ms. Caswell's complaint, Defendants named in this Count had knowledge of both the persistent and widespread policies and practices by medical and correctional employees at ECDC described above and the history of widespread delay or denial of medical care for people detained at the facility with serious medical needs, including pregnant and postpartum women like Ms. Caswell.

178.    As explained above in paragraphs 110–162, Defendants named in this Count either created or had knowledge that the policies, customs, and practices of delaying or denying necessary medical care for pregnant and postpartum women detained at ECDC were harmful to the health and wellbeing of the pregnant and postpartum women in their custody and their growing babies and caused them to experience unnecessary pain and suffering that constituted deliberate indifference to constitutional rights.  Defendants had such knowledge from various sources,

including complaints and grievances filed by people detained at the facility, communications from ECDC staff, media reports, their own observations, and common sense.

179.   Defendants named in this Count and/or ECDC staff reporting to them were the recipients of numerous verbal requests, formal grievance complaints, letters, and medical request forms detailing the widespread abuse and persistent practices of unconstitutional deprivations of medical care for pregnant and postpartum women detained at ECDC.

180.   Despite knowledge of these repeated unconstitutional deprivations of medical care and the need to correct these deprivations, Defendants named in this Count failed to ensure that people detained at ECDC, including Ms. Caswell, received adequate medical care and access to medical care.

181.   Defendants named in this Count allowed these widespread policies, customs, and practices to persist by failing to provide adequate training and supervision of ECDC staff, failing to adequately punish and discipline personnel who engaged in similar misconduct, and failing to take any minimally adequate action to address these pervasive problems.  Accordingly, Defendants named in this Count maintained and ratified policies, customs, and practices that caused the violations of Ms. Caswell's constitutional rights described in this complaint.

182.   Ms. Caswell's injuries were caused by employees of Etowah County, the Etowah County Sheriff's Office, Doctors' Care, and CED, including, but not limited to, the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct against Ms. Caswell described in this complaint.

183.   Defendants' deliberate indifference to Ms. Caswell's serious medical needs directly and proximately caused her physical and emotional injuries, and Defendants' conduct was

motivated by evil motive or intent and involved reckless or callous indifference to Ms. Caswell's federally protected rights.

**Count III**

**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs (Fourteenth Amendment—*Monell*)**

**Against Defendants Doctors' Care and CED**

184.   Ms. Caswell re-alleges and incorporates by reference paragraphs 110–162 above.

185.   The Constitution requires that medical contractors ensure that detained individuals receive adequate medical care.  Deliberate indifference to the serious medical needs of a person detained pretrial violates the Due Process Clause of the Fourteenth Amendment.  Medical contractors are treated as a municipality for purposes of Section 1983 claims and subject to the municipal liability scheme set forth in *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978).

186.   Defendants Doctors' Care and CED, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Ms. Caswell in violation of the Fourteenth Amendment.

187.   At all relevant times, Defendant Doctors' Care contracted with Defendant Etowah County to provide medical care to persons detained at ECDC.  Defendant CED contracted with Defendant Etowah County and/or Doctors' Care beginning on or around October 2021 to provide mental health services to persons detained at ECDC.

188.   As described in paragraphs 110–162 above, before the events giving rise to Ms. Caswell's complaint, Defendants Doctors' Care and CED had notice of widespread policies, customs, and practices by medical and correctional ECDC staff under which detainees like Ms. Caswell with serious medical needs, including pregnant and postpartum women, were routinely denied medical care and access to medical care, or were provided only delayed access to medical

52

care, including without a medical explanation for the delay or for non-medical reasons.  Incidents of delay or denial of medical care to pregnant or postpartum women of a similar nature to Ms. Caswell's were not isolated incidents.  To the contrary, they were obvious, flagrant, rampant, and of a continued duration.

189.    Defendants Doctors' Care and CED, and Defendants Buck and Page, the final policymakers for Doctors' Care, were on notice and had knowledge that the policies, customs, and practices of delaying or denying necessary medical care for pregnant and postpartum women detained at ECDC were harmful to the health and wellbeing of the pregnant and postpartum women in their custody and their growing babies and caused them to experience unnecessary pain and suffering.  Defendants had such knowledge from various sources, including complaints and grievances filed by people detained at the facility, communications from ECDC staff, media reports, their own observations, and common sense.

190.    Defendants Buck and Page, other ECDC medical staff employed by Defendants Doctors' Care, and staff employed by CED received numerous verbal requests and written medical request forms detailing the unconstitutional denial of care to pregnant and postpartum individuals detained at ECDC.

191.    Defendants Doctors' Care and CED, and Defendants Buck and Page had knowledge that many pregnant or postpartum people detained at ECDC experienced this pattern of delay or denial of medical care.  Defendants' conduct in their roles as medical contractors at ECDC created, maintained, and/or contributed to widespread policies, customs, and practices at ECDC pursuant to which pregnant and postpartum women receive unconstitutionally inadequate medical care.  These policies, customs, and practices include those under which pregnant and postpartum women commonly are restricted or limited in receiving regular prenatal and

postpartum care; are denied prescribed medications; are denied access to breast pumps; are not treated by outside medical providers, even in emergency situations, including active labor; do not receive adequate responses to obvious signs of serious medical needs; do not receive adequate examinations of serious medical conditions; do not receive timely medical care; and do not receive responses to their medical requests or grievances regarding medical care.

192.    These widespread policies, customs, and practices were and are so well-settled that they are the de facto policy at ECDC.  Defendants Doctors' Care and CED were deliberately indifferent to the problem.  They encouraged and created the conditions for the problem to persist, failed to provide adequate training and supervision of medical care and correctional employees, failed to adequately punish and discipline prior instances of similar misconduct, and failed to take proper remedial action after prior incidents, thereby implicitly ratifying the policies, customs, and practices that resulted in Ms. Caswell's injuries.  By failing to take any minimally adequate action to address the pervasive failure of correctional and medical staff to provide timely care to people detained at ECDC, and by actively ordering and overseeing the provision of constitutionally deficient medical care, Defendants Buck and Page, as final policymakers of Defendant Doctors' Care, were also deliberately indifferent to the problem, thereby effectively ratifying it.

193.    Employees of Doctors' Care and CED, including, but not limited to, the individually named Defendants, caused Ms. Caswell's injuries by acting pursuant to the foregoing policies and practices.  Defendants Doctors' Care's and CED's conduct was motivated by evil motive or intent and involved reckless or callous indifference to Ms. Caswell's federally protected rights.

**Count IV**
**42 U.S.C. § 1983 – Denial of Medical Care (Fourteenth Amendment—*Monell*)**
**Against Defendant Etowah County**

194.    Ms. Caswell re-alleges and incorporates by reference paragraphs 110–162 above.

195.    The Constitution requires that counties provide detained persons, at the expense of the county, necessary medicine and medical attention.  A county's policy, custom, or practice of not properly funding medical care for detention facilities is properly subject to municipal liability pursuant to *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978).  Defendant Etowah County, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Ms. Caswell in violation of the Fourteenth Amendment.

196.    As described in paragraphs 152–155 above, Defendant Etowah County intentionally refused to fund medical care at ECDC adequately with deliberate indifference to the serious medical needs of people like Ms. Caswell.  Defendant Etowah County had a policy, custom, or practice of not adequately funding medical care for people detained at ECDC and implementing cost-saving measures at ECDC.  Defendant Etowah County ignored known incidents of deliberate indifference by Doctors' Care and also continued to retain Doctors' Care as ECDC's medical contractor despite knowledge of Doctors' Care's policies, customs, and practices and the history of widespread delay and denial of medical care under Doctors' Care's tenure as medical contractor—including delay and denial of medical care for pregnant and postpartum women detained at ECDC.

197.    Defendant Etowah County is also liable for the acts of the Etowah County Sheriff's Office, CED, Doctors' Care, and its policymakers, including Defendants Horton, Buck and Page, as Etowah County delegated policymaking authority to them.

198.    As described in paragraphs 110–162 above, before the events giving rise to Ms. Caswell's complaint, Defendant Etowah County had notice of widespread policies, customs, and practices by Doctors' Care, CED, and medical and correctional ECDC staff pursuant to which detainees like Ms. Caswell with serious medical needs, including pregnant and postpartum women,

were routinely denied medical care and access to medical care, or were provided only delayed access to medical care, including without a medical explanation for the delay or for non-medical reasons.  As described above in paragraphs 110–151, incidents of delay or denial of medical care to pregnant or postpartum women of a similar nature to Ms. Caswell's were not isolated incidents. To the contrary, they were obvious, flagrant, rampant, and of a continued duration.

199.    There exist widespread policies, customs, and practices at ECDC pursuant to which pregnant and postpartum women receive unconstitutionally inadequate medical care, including policies, customs, and practices under which pregnant and postpartum women commonly are restricted or limited in receiving regular prenatal and postpartum care; are denied prescribed medications; are denied access to breast pumps; are not treated by outside medical providers, even in emergency situations, including active labor; do not receive adequate responses to obvious signs of serious medical needs; do not receive adequate examinations of serious medical conditions; do not receive timely medical care; and do not receive responses to their medical requests or grievances regarding medical care.

200.    Defendant Etowah County was on notice and had knowledge that these policies, customs, and practices were harmful to the health and wellbeing of the pregnant and postpartum women in custody at ECDC and their growing babies and caused them to experience unnecessary pain and suffering.  Defendant Etowah County was on notice that its policy, custom, and practice of underfunding medical care at ECDC caused this harm.  Defendant Etowah County had such knowledge from various sources, including complaints and grievances filed by people detained at the facility, communications from ECDC staff, media reports, the 60 Days In program, their own observations, and common sense.

201.    Additionally, as described in paragraphs 110–111 above, because of Etowah County's unusually high rate of detaining pregnant and postpartum women, it was particularly foreseeable and plainly obvious that Defendants' deliberate indifference to the serious medical needs of such people would lead to breaches of care and needless pain, suffering, and injuries.

202.    Despite this knowledge, Defendant Etowah County did nothing to ensure people detained at ECDC received adequate medical care and access to medical care.  Rather, as described in paragraphs 152–155 above, Defendant Etowah County maintained and continually re-signed its contract with Doctors' Care, which included provisions that disincentivized providing adequate medical care or outside medical services to pregnant and postpartum women at ECDC, thereby acting with deliberate indifference.  By failing to take any minimally adequate action to address the underfunding and the resulting problems, Defendant Horton and the Etowah County Commission, as final policymakers of Etowah County, were also deliberately indifferent to the problem, thereby ratifying it.

203.    Etowah County knew or should have known that Ms. Caswell's injuries were a plainly obvious consequence of its failure to fund medical care at ECDC adequately and its decision to continue contracting with Doctors' Care.  Defendant Etowah County thus caused Ms. Caswell's injuries, and its conduct was motivated by evil motive or intent and involved reckless or callous indifference to Ms. Caswell's federally protected rights.

**Count V**
**Intentional Infliction of Emotional Distress**
**Against Defendants Horton, Keith Peek, Doctors' Care, CED, Buck, Page, Cassi Peek, Dillard, Lopez, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, Jane Doe 1, and John or Jane Doe 2**

204.    Ms. Caswell re-alleges and incorporates by reference paragraphs 33–109 above.

205.    As described above, by delaying, denying, or providing inadequate medical care to Ms. Caswell, Defendants named in this Count all engaged in extreme and outrageous conduct so

atrocious in character and extreme in degree as to be outside the common bounds of decency and utterly intolerable in a civilized society.

206.    Defendants' extreme and outrageous conduct included (i) failing to provide Ms. Caswell with regular prenatal care during her high-risk pregnancy, causing Ms. Caswell emotional distress and concern about her own health and safety, as well as that of her growing baby; (ii) failing to provide Ms. Caswell with her prescribed psychiatric medications during her pregnancy and postnatal recovery, greatly and needlessly increasing her emotional distress; (iii) failing to provide Ms. Caswell with medical attention, pain medication, or assistance during her labor and delivery, ultimately leaving her to give birth alone in a shower room; (iv) failing to provide Ms. Caswell with access to pain medication, pads, or a bed while she recovered from her traumatic birth; and (v) failing to provide Ms. Caswell with a breast pump, despite a doctor's recommendation and her symptoms of mastitis.

207.    Defendants knew that Ms. Caswell was particularly susceptible to emotional distress given that she was experiencing a high-risk pregnancy, she had previously been hospitalized for an attempted suicide, and she had been diagnosed with mental health conditions, including bipolar disorder, depression, and anxiety.  Defendants also knew that Ms. Caswell was vulnerable to emotional distress as she had experienced severe trauma, including a sexual assault, during her earlier pregnancy at ECDC.  Defendants intended to cause, or knew or should have known that their conduct would result in, severe emotional distress to Ms. Caswell.

208.    Defendants' conduct caused Ms. Caswell emotional distress so severe that no person could be expected to endure it.

209.    Defendants employed by Doctors' Care committed these actions in the line and scope of their employment and in furtherance of the business of Doctors' Care.  Defendants

employed by CED committed these actions in the line and scope of their employment and in furtherance of the business of CED.

210.   Defendants' outrageous misconduct directly and proximately caused the violation of Ms. Caswell's rights and caused Ms. Caswell to suffer traumatic loss, injuries, and damages, including, but not limited to, physical injury, mental anguish, pain and suffering, and severe emotional distress.

211.   Defendants consciously or deliberately engaged in oppression, wantonness, or malice with regard to Ms. Caswell.  Defendants acted with a reckless or conscious disregard for the rights and safety of Ms. Caswell, and they subjected her to cruel and unjust hardship in conscious disregard of her rights.

**Count VI**
**Negligent or Wanton Conduct**
**Against Defendants Horton, Keith Peek, Doctors' Care, CED, Buck, Page, Cassi Peek,**
**Dillard, Lopez, Presley, Randolph, McIntyre, Davis, Holliday, King, Thornton, Jane Doe 1**
**and John or Jane Doe 2**

212.   Ms. Caswell re-alleges and incorporates by reference paragraphs 33–109 above.

213.   Defendants named in this Count owed a duty to Ms. Caswell, including under Alabama Code § 14-6-19.  Alabama Code § 14-6-19 requires that Defendants provide detainees in ECDC "[n]ecessary clothing and bedding; [n]ecessary medicine and medical attention to those prisoners who are sick or injured";[25] and "[f]eminine hygiene products to female prisoners, as soon as is practicable, upon request by the female prisoner."[26]

214.   Defendants had a duty to provide adequate and necessary medication and medical attention to Ms. Caswell and other people detained at ECDC, to ensure that staff under their

---

[25]   ALA. CODE § 14-6-19 (2022).
[26]   *Id.*

supervision were adequately trained regarding proper medical care and access to medical care for people like Ms. Caswell under their care, and/or to ensure that adequate policies and procedures regarding medical care and access to medical care for people detained at ECDC were in place.

215.    In the manner described above, Defendants breached the duty of care owed to Ms. Caswell by negligently delaying, denying, or inadequately responding to Ms. Caswell's requests for medical care, including (i) failing to provide Ms. Caswell with regular prenatal care during her high-risk pregnancy, causing Ms. Caswell emotional distress and concern about her own health and safety, as well as that of her growing baby; (ii) failing to provide Ms. Caswell with her prescribed psychiatric medications during her pregnancy and postnatal recovery, greatly and needlessly increasing her emotional distress; (iii) failing to provide Ms. Caswell with medical attention, pain medication, or assistance during her labor and delivery, ultimately leaving her to give birth alone in a shower room; (iv) failing to provide Ms. Caswell with access to pain medication, pads, or a bed while she recovered from her traumatic birth; and (v) failing to provide Ms. Caswell with a breast pump, despite a doctor's recommendation and her symptoms of mastitis.

216.    Defendants' actions were willful and wanton in that they demonstrated an utter indifference to the safety of others.  Defendants consciously engaged in the conduct described above with the knowledge that such conduct would probably and likely cause injury to Ms. Caswell and her developing baby.

217.    Defendants employed by Doctors' Care committed these actions in the line and scope of their employment and in furtherance of the business of Doctors' Care.  Defendants employed by CED committed these actions in the line and scope of their employment and in furtherance of the business of CED.

218.    As a direct and proximate result of Defendants' negligent, wanton, and/or willful conduct, Ms. Caswell suffered injuries, including physical injury, mental anguish, pain and suffering, and severe emotional distress.

219.    Defendants consciously or deliberately engaged in oppression, wantonness, or malice, acting with a reckless or conscious disregard for Ms. Caswell's rights and safety and subjecting her to cruel and unjust hardship in conscious disregard of her rights.

## OTHER MATTERS

220.    All conditions precedent to the bringing of this suit have occurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ashley Caswell respectfully requests that this Court enter a judgment in her favor and against Defendants as follows:

  i.     An award of compensatory, punitive, and nominal damages against all Defendants;

  ii.    An award of prejudgment and post-judgment interest at the highest rates allowed by law;

  iii.   An order awarding Plaintiff her reasonable costs, including attorneys' fees and expert witness fees, incurred in bringing this action;

  iv.    An order awarding Plaintiff appropriate declaratory relief; and

  v.     Any other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 13, 2023                    Respectfully Submitted,


                                           /s/ *Ashley Light*
                                           Ashley Light
                                           Rebecca Ramaswamy (N.D. Ala. admission pending)
                                           SOUTHERN POVERTY LAW CENTER
                                           400 Washington Avenue
                                           Montgomery, Alabama 36104
                                           Telephone: (334) 956-8200
                                           ashley.light@splcenter.org

                                           Andrea Alajbegovic (*pro hac vice* pending)
                                           SOUTHERN POVERTY LAW CENTER
                                           111 East Capitol St., Suite 280
                                           Jackson, Mississippi 39201
                                           Telephone: (601) 265-8309
                                           andrea.alajbegovic@splcenter.org

                                           Emma Roth (*pro hac vice* pending)
                                           Dana Sussman (*pro hac vice* pending)
                                           PREGNANCY JUSTICE
                                           575 Eighth Avenue, FL. 7N
                                           New York, New York 10018
                                           Telephone: (212) 255-9252
                                           emma.r@pregnancyjusticeus.org

                                           Sharon Cohen Levin (*pro hac vice* pending)
                                           Beth D. Newton (*pro hac vice* pending)
                                           Jessica Klein (*pro hac vice* pending)
                                           Kirandeep K. Mahal (*pro hac vice* pending)
                                           Stephanie M. Kelly (*pro hac vice* pending)
                                           Bailey N. Springer (*pro hac vice* pending)
                                           SULLIVAN & CROMWELL LLP
                                           125 Broad Street
                                           New York, New York 10004-2498
                                           Telephone: (212) 558-4000
                                           Facsimile: (212) 558-3588
                                           levinsc@sullcrom.com

                                           *Attorneys for Plaintiff Ashley Caswell*